164 So.2d 300

**NEW ORLEANS AND NORTHEASTERN
RAILROAD COMPANY**

**v.**

**LOUISIANA PUBLIC SERVICE
COMMISSION.**

**No. 47068.**

May 4, 1964.

Dissenting Opinion May 15, 1964.

Rehearing Denied June 8, 1964.

Monroe & Lemann, Malcolm L. Monroe, Walter J. Suthon, Jr., Benj. R. Slater, Jr., New Orleans, for plaintiff-appellant.

Joseph H. Kavanaugh, Baton Rouge, for defendant-appellee.

Joseph H. Hurndon, Asst. City Atty., Ralph L. Kaskell, Jr., of Deutsch, Kerrigan & Stiles, New Orleans, for intervenors-appellees.

Eberhard P. Deutsch, René H. Himel, Jr., Wm. S. Stone, New Orleans, for appellees.

HAMLIN, Justice.

In this proceeding instituted on November 27, 1963 against the Louisiana Public Service Commission (hereinafter referred to as the Commission), plaintiff, New Orleans and Northeastern Railroad Company (hereinafter referred to as the Railroad), prayed that there be judgment in its favor decreeing that the Commission is without jurisdiction ratione materiae to hear or determine the cause entitled Board of Levee Commissioners of the Orleans Levee District v. New Orleans and Northeastern Railroad Company, bearing No. 9142 of the Docket of the Commission, and to issue any orders or take any further action or perform any acts of any kind or nature whatsoever, to order or require the Railroad to effect, open or construct, or to permit or allow the Board of Levee Commissioners of the Orleans Levee District, the City of New Orleans, the Board of Commissioners of the Port of New Orleans, or any other agency or municipality, person, firm or corporation to effect, open or construct a street or roadway crossing at grade over and across petitioner's right of way and line of railroad tracks between Lakeshore Drive (Southline Drive) and Hayne Boulevard in the City of New Orleans. Plaintiff prayed for a temporary restraining order and a preliminary injunction, later to be made permanent. Alternatively, plaintiff prayed that if an injunction did not issue, that the case be remanded to the Commission in order that proper proof could be adduced on the merits on all issues herein involved.

A temporary restraining order was issued on the day the petition was filed; a rule

nisi issued ordering the defendant to show cause why a preliminary injunction should not issue in the cause as prayed for and according to law.

The Commission answered, averring in part that plaintiff could not enjoin the public, and that defendant's jurisdiction over railroad grade crossings extended to all public streets and roads throughout the State of Louisiana, including those in the Parish of Orleans; it prayed that plaintiff's petition be dismissed.

The Board of Levee Commissioners of the Orleans Levee District (hereinafter referred to as the Levee Board) intervened in the matter, uniting itself with the Commission in resisting the claims of the Railroad and praying for the dismissal of plaintiff's suit. The City of New Orleans also united with the Commission in resisting plaintiff's demands.

The matter was heard on December 9, 1963, the application for a preliminary injunction being consolidated with the application for a permanent injunction. The trial court recalled the rule nisi, dissolved the temporary restraining order previously issued, denied the writs of injunction prayed for, and rejected plaintiff's demands. The matter is now before this Court on appeal. Art. VI, Sec. 5, La.Const. of 1921 LSA. See, 245 La. 786, 161 So.2d 272.

In this Court, appellant Railroad states:

"The sole issue presented for determination in the instant case is whether the Defendant, Louisiana Public Service Commission, has jurisdiction ratione materiae to hear proceedings and issue an order directing the Railroad to permit the City of New Orleans and the Orleans Levee Board to construct and open a railroad crossing, at grade, across the Railroad's main line tracks within the territorial limits of the City of New Orleans. The fundamental error of the District Court was its finding that the Defendant Commission had jurisdiction."

The matter which plaintiff seeks to enjoin the Commission from hearing originated with a petition of the Levee Board filed against the Railroad before the Commission on September 26, 1963. The Levee Board alleged in part:

"II.

"Pursuant to RS 45:841:42, petitioner, the City of New Orleans, and the Board of Commissioners of the Port of New Orleans, have all, as shown by documents on file with the Commission, duly certified to this Commission the need for a grade crossing over the track of defendant lying between Lakeshore Drive and Hayne Boulevard, in the City of New Orleans just west of the Seabrook Bridge at the mouth of the Inner Harbor Navigation Canal, which certification shows that defendant has refused to permit the construction of the aforesaid crossing.

"III.

"No genuine issue exists or can exist as to

"a—The fact of refusal;

"b—The clear and immediate need for emergency relief of severe traffic congestion in the aforesaid area;

"c—The cost of the project, to be borne wholly by petitioner, the City of New Orleans, and the Board of Commissioners of the Port of New Orleans;

"d—The simple, routine construction involved.

"IV.

"Under Article 16, Sections 7(c) and (e) of the Constitution of 1921, RS 38:1239, and other applicable authority, petitioner has the right to construct a street and/or other works between Lakeshore Drive and Hayne Boulevard in the area where the crossing is desired.

"V.

"Petitioner desires an order authorizing, and requiring defendant to permit, immediate construction of the crossing, without interference by defendant, and, on the contrary, affirmatively requiring defendant to cooperate fully with petitioner in the prompt execution of the work, except that it need not bear the cost thereof.

"VI.

"The matter is one of general interest to the public within the provisions of Section 1, Subsection K(2) of the Rules of Practice of this Commission."

The City of New Orleans intervened in the above matter, alleging in part:

"V.

"Intervenor joins the BOARD OF LEVEE COMMISSIONERS OF THE ORLEANS LEVEE DISTRICT and the BOARD OF COMMISSIONERS OF THE PORT OF NEW ORLEANS in urging the necessity for an order authorizing, and requiring defendant to permit, immediate construction of the crossing, without interference by defendant, and, on the contrary, affirmatively requiring defendant to cooperate fully with the BOARD OF LEVEE COMMISSIONERS OF THE ORLEANS LEVEE DISTRICT in the prompt execution of the work, except that it need not bear the cost thereof.

"VI.

"The matter is one of general interest to the public within the provisions of Section 1, Subsection K(2) of the Rules of Practice of this Commission.

"WHEREFORE intervenor prays that after notice, defendant be required promptly to answer this petition of in-

tervention; that the matter be treated summarily and the Commission order defendant to show cause on a date to be fixed by the Commission, why an order should not be entered by this Commission granting the aforesaid relief and such other and further relief as may be required; and that, after due hearing, all such relief be granted."

The Railroad excepted to the jurisdiction ratione materiae of the Commission to hear or determine the cause set forth by the Levee Board and the City of New Orleans in their petitions and to issue the proposed order. It also filed other exceptions which in substance set forth objections to the jurisdiction of the Commission.

The Commission overruled the exceptions filed by the Railroad and ordered the matter set for hearing on the merits. The present injunction proceedings were then instituted.

At the time the Levee Board filed the above petition, the Railroad owned and operated in interstate commerce a main line of railroad connecting the City of Meridian, Mississippi, with the City of New Orleans, Louisiana, over which freight and passenger trains moved several times daily. Part

of the Railroad's right of way was (and is now) located in the City of New Orleans and extended (and does now) along the south shore of Lake Pontchartrain from Downman Road in a westerly direction towards Peoples Avenue, crossing the Inner Harbor Navigation Canal (Industrial Canal) and continuing in a westerly direction between Lakeshore Drive (Southline Drive) and Hayne Boulevard.

On October 22, 1947, pursuant to the power and authority granted it by the State of Louisiana through Article XIV, Section 31.3, the City entered into a written contract, referred to herein as the UPT Agreement, with the Railroad and other railroad carriers entering New Orleans to provide for the construction of a passenger station and providing for the elimination of railroad grade crossings and an extensive grade separation program within the City.

Among the principal obligations undertaken by the City in the UPT Agreement were the obligations contained in Section 12A(1) of the UPT Agreement to close certain designated grade crossings and to effect any future crossings of the railroad lines therein designated at separated grades by means of an underpass or overpass.[1]

---

1. "The City agrees, on or prior to Completion Date, to close all crossings at grade other than those for which grade separations are provided for under the provisions of Section 11 hereof, across the following portions of railroad lines:
"(i) New Orleans and Northeastern

Railroad Company's main line from Downman Road to the north property line of St. Claude Avenue, *except* crossing at Industry Street;" Art. II, Sec. 12 (A), UPT Agreement.
"The City further agrees that, except with respect to the crossings expressly

On or about April 12, 1955, the City physically closed and barricaded the instant grade crossing, preventing its use by the public and at all times since April 12, 1955, the crossing has been closed to the public and traffic has not been permitted to cross the Railroad right of way at the site of the former temporary grade crossing.[2]

On September 19, 1963, the Commission Council for the City of New Orleans passed the following resolution which set forth the asserted need for the instant grade crossing which the Levee Board requested the Commission to permit it to construct without interference by the Railroad.[3]

"WHEREAS, careful and comprehensive studies, including actual motor vehicle traffic counts, have established these essential facts: (1) that almost 16,000 motor vehicles cross the Seabrook Bridge each day; (2) that approximately 13,400 of these vehicles cross on the north, or lakeside, roadway, and only about 3,000 vehicles cross on the south, or riverside, roadway; (3) that the number of eastbound vehicles and the number of westbound vehicles that cross the bridge each day are almost equal; (4) that the 'practical capacity' of the north, or lakeside, roadway, which is about 750 vehicles an hour, is being grossly exceeded during several hours each day; but that the south, or riverside, roadway is being used to only about one-third of its 'practical capacity'; (5) that the people of the City of New Orleans have been forced to suffer, for many years, serious inconvenience, with much loss of time and money, as a result of the gross inadequacy of this bridge, and the present traffic patterns; (6) that the number of motor vehicles crossing the bridge has increased substantially in the past year, and is expected to continue to increase, and the people of metropolitan New Orleans will be forced to suffer even more serious inconvenience in the future, unless effective remedial measures are employed immediately; (7) that the City of New Orleans, the Orleans Levee Board, and the New Orleans Dock Board, in co-

---

excepted in Paragraph A of this section, and except with consent of the Carrier involved, or of the Committee in the case of the lines referred to in subparagraph (iv), Paragraph A of this section, it will effect all future crossings of the lines referred to in Paragraph A by means of an underpass or overpass, provided that temporary crossings for emergency purposes only may be made at grade for a period of time to be agreed upon with the Carrier affected or the Committee." Art. II, Sec. 12(B), UPT Agreement.

2. The crossing was opened in 1941 by special agreement resulting from the National Emergency then existing. It was kept open by subsequent agreements executed between the Railroad and the City of New Orleans.

3. This resolution is attached to the Railroad's petition for injunction.

operation with each other, have put forth their best efforts to provide relief for motorists (a) by installing traffic lights on the approaches to the north, or lakeside, roadway; (b) by establishing a schedule that, except in emergencies, prohibits the raising of the bridge because of water traffic during the time periods from 6:30 AM to 8 AM and 4:30 PM to 6 PM, each day, when the motor vehicle traffic is greatest; (c) by providing policemen to direct automobile traffic during the busiest times each day; and, (d) by entering into an agreement that provides for the installation of a temporary grade crossing, at the joint expense (estimated at about $35,000) of these three public agencies, across the tracks of the New Orleans & Northeastern Railroad, which railroad is owned, operated, and controlled by the Southern Railway System, so that the eastbound traffic and the westbound traffic can be separated and the north, or lakeside, roadway made a one-way roadway for westbound traffic, and the south, or riverside, roadway made a one-way roadway for eastbound traffic, with all necessary signal and safety devices to provide maximum safety; (8) that the Southern Railway System has refused to permit these public agencies to install this temporary grade crossing, and therefore have prevented these public agencies from serving, as they want to do, the people of metropolitan New Orleans even though the improvements will be installed entirely with public funds and without expense to the Railroad; (9) that the proposed temporary grade crossing will provide substantial relief to the people in metropolitan New Orleans who use this bridge, and save them much in time, trouble and money; (10) that the Orleans Levee Board and the New Orleans Dock Board have certified to the Louisiana Public Service Commission the urgent public need for this temporary grade crossing, and the Orleans Levee Board has called, on September 6, 1963, for bids, through public advertisement, for part of this work (the roadways) to be performed in accordance with plans and specifications prepared by competent professional engineers and approved by the engineering staffs of these three public agencies; (11) that the apparent lowest responsible bidder for this part of the work is R. B. Tyler, Company, Inc.; and (12) action on these bids is pending; and

"WHEREAS, the Louisiana Public Service Commission is scheduled to consider this matter at its next meeting on October 1, 1963.

"NOW, THEREFORE, It is resolved by the Council of the City of New Or-

leans that we hereby declare that there is an immediate and urgent public need for the foregoing temporary grade crossing; and the Louisiana Public Service Commission is requested to issue an appropriate order, and to take all other action necessary and proper to require the Southern Railway System, the New Orleans & Northeastern Railroad, and all other interested or affected parties to permit the immediate construction of the temporary grade crossing, with adequate signal and safety devices, to insure the maximum safety; and,

"It is further resolved that the officials of the Southern Railway System and the New Orleans & Northeastern Railroad, and all other interested and affected parties, are hereby urged: to recognize that the public interest is paramount, and that this temporary grade crossing is absolutely necessary to serve the needs, wants and convenience of the people of the City of New Orleans; to withdraw their objections to the immediate construction of this temporary grade crossing, and to permit the work to be accomplished without further delay; and, to extend immediately their full and active cooperation to the City of New Orleans, the Orleans Levee Board, and the New Orleans Dock Board."

Herein, as it did before the trial court and before the Commission, the Railroad denies the jurisdiction ratione materiae of the Commission to hear or determine whether there should be a temporary grade crossing over and at its tracks located at a designated point within the City of New Orleans, for the following reasons:

"(a) Neither Article VI, Section 4 of the Louisiana Constitution of 1921, nor La.R.S. 45:841–842, nor any other law of the State of Louisiana, vests the Louisiana Public Service Commission with the jurisdiction, power and authority to hear or determine this cause or to issue the proposed order ❋ ❋ " [4]

4. "The Commission shall have and exercise all necessary power and authority to supervise, govern, regulate and control all common carrier railroads, street railroads, interurban railroads, steamboats and other water craft, sleeping car, express, telephone, telegraph, gas, electric light, heat and power, water works, common carrier pipe lines, canals, (except irrigation canals) and other public utilities in the State of Louisiana, and to fix reasonable and just single and joint line rates, fares, tolls or charges for the commodities furnished, or services rendered by such common carriers or public utilities, except as herein otherwise provided.

"The power, authority, and duties of the Commission shall affect and include all matters and things connected with, concerning, and growing out of the service to be given or rendered by the common carriers and public utilities hereby, or which may hereafter be made subject to supervision, regulation and control by the Commission. The right of the Legislature to place other public utilities under the control of and confer other powers upon the Louisiana Public Serv-

"(b) The constitution, statutes and laws of the State of Louisiana, and particularly Act 159 of 1912, as amended, the Home Rule Charter of the City of New Orleans, and Section 31.3 of Article XIV of the Louisiana Constitution of 1921, have vested in the City of New Orleans the exclusive jurisdiction, power and authority to regulate the use of the city streets by railroads and the crossings of streets by lines of railroad within the limits of the City of New Orleans;" [5]

"(c) That R.S. 45:841–843 or any law of the State of Louisiana which

ice Commission respecting common carriers and public utilities is hereby declared to be unlimited by any provision of this Constitution.

"The said Commission shall have power to adopt and enforce such reasonable rules, regulations, and modes of procedure as it may deem proper for the discharge of its duties, and it may summon and compel the attendance of witnesses, sewer witnesses, compel the production of books and papers, take testimony under commission, and punish for contempt as fully as is provided by law for the district courts." Art. VI, Sec. 4, La.Const. of 1921.

"The Louisiana Public Service Commission shall require the owner, possessor or operator of any railway, railroad, tram road, log road, transportation, irrigation or drainage canal, or syphon, crossing any public road already constructed or which may be constructed, to construct and maintain a suitable and convenient crossing over such public road, the crossing to extend to the limits of the right of way, or fifty feet from the center of such railway, railroad, tram road, log road, transportation, irrigation or drainage canal or syphon, in accordance with the standard specifications furnished by the department of highways in respect to such crossings." LSA–R.S. 45:841.

"The various parishes shall certify to the Louisiana Public Service Commission any case where the owner of any railway, railroad, tram road, log road, transportation, irrigation or drainage canal, or syphon, has not constructed or maintained or refuses to construct and maintain, a crossing over a public road in accordance with the standard specifications of the department of highways in respect to such crossings; whereupon, the commission shall enter an appropriate order requiring such crossings to be constructed in accordance with those standard specifications." LSA–R.S. 45:-842.

5. "The legislative, executive and judicial powers of the city of New Orleans shall extend to each and every matter of local and municipal governments. The enumeration of particular powers of this charter shall not be held or deemed to be exclusive, but in addition to the powers enumerated therein or implied thereby or appropriate to the exercise of such powers, it is intended that the city of New Orleans shall have and may exercise all powers, police or otherwise which, under the constitution of the state of Louisiana, it will be competent for this charter specifically to enumerate. All powers of the city, whether expressed or implied shall be exercised in the manner prescribed by this charter, and if not prescribed therein, then in a manner provided for by ordinance or resolution of the council, it being the intent thereof that this charter shall never be construed as impairing or restricting the effect of the general grant of powers of local self-government, which are hereby bestowed." Sec. 1 of Act 159 of 1912, as amended; Dart's La.Gen.Stat., Sec. 6175(h).

"The Commission Council shall also have power: (1) To order the ditching, filling, opening, widening and paving of the pub-

purports to grant unto the Louisiana Public Service Commission, an agency

of the State of Louisiana, jurisdiction to issue an order directing the opening

lic streets, and to regulate the grade thereof, * * *." Sec. 8, subd. 1 of Act 159 of 1912.

"(12) To authorize the use of the streets for busses, railroads operated by horse, gas, electricity, steam or other motive power, and to regulate the same; to require and compel all lines of railway or tramway in any one street to run on and use one and the same track and turntable, to compel them to keep conductors on their cars and compel all such companies to keep in repair the street bridges and crossings through or over which their cars run." Sec. 8, subd. 12 of Act 159 of 1912, as amended; Dart's La.Gen. Stat., Sec. 6182(1) (12).

"(1) The City shall retain to the same extent as if herein repeated, all rights, powers, privileges and authority that it has or could claim under the law of this State at the time of the adoption hereof, except as herein expressly modified. "(2) In addition to the foregoing, the City shall have all rights, powers, privileges and authority herein conferred or herein enlarged, and all rights, powers, privileges and authority whether expressed or implied that may hereafter be granted to a similar corporation by any general law of the State, or that may be necessary or useful to enjoy a home rule charter.

"(3) The rights, powers, privileges and authority heretofore enjoyed, herein retained or herein claimed shall subsist, notwithstanding the repeal of any law, until any such right, power, privilege or authority be altered or taken away by amendment to this Charter in the manner provided for by the Constitution. "(4) The City, in addition to the rights, powers, privileges and authority expressly conferred upon it by this Charter, shall have the right, power, privilege and authority to adopt and enforce local police, sanitary and similar regulations, and to do and perform all of the acts pertaining to its local affairs, property and govern-

ment, which are necessary or proper in the legitimate exercise of its corporate powers and municipal functions. "(5) No enumeration of any right, power, privilege or authority hereinafter made, and no repeal of any law under which the City derives any right, power, privilege or authority, shall be construed as limiting or abolishing any right, power, privilege or authority hereinabove set forth." Home Rule Charter (Sec. 2–101), City of New Orleans, May, 1954. "*General authorizations.* The City of New Orleans, acting through the Public Belt Railroad Commission, shall have the power, in any manner it may determine, to acquire, construct, maintain and operate one or more railroad passenger stations, with all approaches thereto and appurtenances thereof, * * *

* * * * *

"The powers herein granted may be exercised anywhere in the Parish of Orleans or in any parish adjacent thereto. In connection with any project for building any such passenger station or stations, the City of New Orleans, through said Commission, shall have the power to do everything it deems necessary or desirable for the purpose of minimizing interference, caused by railroad traffic of any sort, with the use of streets, thoroughfares and roads, and with the proper development of the City of New Orleans. * * *" Art. XIV, Sec. 31.3, La.Const. of 1921.

"*Contracts.* The City of New Orleans, through the Public Belt Railroad Commission, shall have the authority to enter into a contract or contracts, containing such terms, conditions, stipulations and provisions, and for such duration, as may be approved by the vote of a majority of all the members of said Commission, with any railroad company or railroad companies entering or hereafter entering New Orleans, for the use by such railroad company or railroad companies of said passenger station or stations, and the ap-

of railroad crossings of streets within the territorial limits of the City of New Orleans is unconstitutional, illegal, null and void in conflict with and in contravention of the 1938 amendment to the Constitution of the State of Louisiana providing for the Union Passenger Terminal facilities and which is now Article XIV, Section 31.3, and the Home Rule Charter of the City of New Orleans as authorized by Article XIV, Section 22 as amended by Act 551 of 1950 of the Louisiana Constitution of 1921 in which the State of Louisiana has vested in the City of New Orleans the exclusive jurisdiction, power and authority to regulate the use of the city streets by railroads and the crossings of streets by lines of railroad within the territorial limits of the City.

"(d) The power and authority delegated by the State of Louisiana to the City of New Orleans through Act 159 of 1912 as amended, the Home Rule Charter of the City of New Orleans, and particularly by Article XIV, Section 31.3 (Louisiana Constitution of 1921) empowering the City to regulate the crossings of streets by railroads within the limits of the City for purposes of minimizing interference caused by railroad traffic with the use of the City streets and for the proper development of the City of New Orleans, can not be transferred, delegated or surrendered by the City of New Orleans to either the Louisiana Public Service Commission or the Orleans Levee Board, or any other state board or agency, nor can the City exercise through the Commission, the powers vested in it. Any attempt or purported exercise, transfer, delegation or surrender of such powers or authority by

proaches thereto and appurtenance thereof, and/or of any tracks or other property, constructed pursuant to Section 31.3 hereof, * * *" Art. XIV, Sec. 31.3 (A), La.Const. of 1921.
"*Grade Crossing Elimination.* Any project hereunder may include such provisions as may be agreed to by the City of New Orleans, through the Public Belt Railroad Commission, or determined by the City of New Orleans, through its Commission Council, for eliminating grade crossings of any tracks used or to be used for reaching the aforesaid passenger station or stations or any other railroad tracks. All or any part of the cost of eliminating grade crossings of any tracks, to the extent agreed to by

the City of New Orleans, through the Public Belt Railroad Commission, or determined by the City of New Orleans, through its Commission Council, may be defrayed by the issue of bonds pursuant to Subsection (B) hereof; but the City of New Orleans is hereby empowered to contribute any funds towards such cost to such extent as its Commission Council may determine; * * *
   *    *    *    *    *
"The elimination of grade crossings of railroad tracks is hereby declared to be a permanent public improvement within the meaning of Act 341 of 1936; * * *" Art. XIV, Sec. 31.3(D), La.Const. of 1921.

the City of New Orleans is illegal, null, void, and in contravention of law and particularly, Article XIV, Section 31.3, and can not vest in or bestow upon the Commission, jurisdiction ratione materiae to hear or determine this cause." [6]

The Commission contends that LSA–R.S. 45:841, supra, supports its jurisdiction; it argues that the statute grants the Commission state wide jurisdiction. It also argues that despite the fact that the Statute employs the phrase "public road," the nouns "streets" and "roads" are interchangeable. The Commission still further urges that the interventions of the Levee Board and the City of New Orleans support the Commission's jurisdiction; still further, the Commission contends that the Home Rule Charter of the City of New Orleans, 1954, and UPT Agreement do not oust the Commission's jurisdiction. Finally, the Commission urges that its jurisdiction does not invade the right of the City of New Orleans to regulate its streets.

Urging an affirmative determination of its contentions, the Railroad relies upon the case of Louisiana Public Service Commission v. Morgan's Louisiana & T.R. & S.S. Co., 264 U.S. 393, 44 S.Ct. 358, 68 L.Ed. 756, wherein the Commission directed "that within fifteen days from the date of this order the Morgan's Louisiana & Texas Railroad & Steamship Company shall commence to repair and put in a safe and suitable condition for vehicular and other traffic, such repairs to be completed within a reasonable time thereafter, the existing viaduct over, above, and across the properties of the said Morgan's Louisiana & Texas Railroad & Steamship Company in the Fifth municipal district of the city of New Orleans * * *"

In the Morgan's Case, the railroad contended that the order was invalid because it was beyond the power of the Commission, and that if said order was within such power, enforcement would deprive the company of property without due process of law and impair the obligation of its contract with the City of New Orleans, contrary to the Federal Constitution. In affirming the railroad's contention, the U. S. Supreme Court stated:

"Unless and until otherwise advised by the supreme court of Louisiana, we must conclude that the general control of its own streets is an ordinary governmental function of the city of New Orleans.

"It would require more definite language than we find in the Constitution of 1921, or in Gulf, C. & S. F. Ry. v. [Louisiana] Public Service Commission [151 La. 635, 92 So. 143], to convince us that the commission has power to assume control over all those streets

---

6. The above arguments are taken from plaintiff's original petition, Art. 11. They express the identical contentions set forth in the Railroad's brief filed herein.

within New Orleans which approach or cross railroad tracks, and to disregard the solemn contracts of the municipality with respect thereto. That the liability which the commission has undertaken to impose upon appellee conflicts with the contract under which the latter granted permission to construct the viaduct over its property, is not denied. Only very clear and definite words would suffice to show that the state had undertaken to authorize a thing so manifestly unjust and oppressive."

Where a question of state law is at issue, the U. S. Supreme Court has evidenced a tendency in recent years to stay proceedings in federal proceedings until the state court passes upon the matter. In Louisiana Power & Light Company v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed. 2d 1058, rehearing denied, 360 U.S. 940, 79 S.Ct. 1442, 3 L.Ed.2d 1552, it stated:

"Caught between the language of an old but uninterpreted statute and the pronouncement of the Attorney General of Louisiana, the district judge determined to solve his conscientious perplexity by directing utilization of the legal resources of Louisiana for a prompt ascertainment of meaning through the only tribunal whose interpretation could be controlling—the Supreme Court of Louisiana. The District Court was thus exercising a fair and well-considered judicial discretion in staying proceedings pending the institution of a declaratory judgment action and subsequent decision by the Supreme Court of Louisiana." See, also, Alabama Public Service Commission v. Southern Railway Company, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002.

■ We do not feel bound by the decision of the U. S. Supreme Court in the case of Louisiana Public Service Commission v. Morgan's Louisiana & T. R. & S. S. Co., supra, because at that time this Court had not considered a similar matter or a matter involving the jurisdiction of the Commission such as is involved herein. The Morgan's Case originated in the federal district court (287 F. 390) and not in a state court. The case of Gulf, C. & S. F. R. Co. v. Louisiana Public Service Commission, 151 La. 635, 92 So. 143, which the U. S. Supreme Court did not think was persuasive therein, did not involve a question of jurisdiction such as that at issue herein.

We now approach a determination of whether the Commission has jurisdiction ratione materiae of a matter such as the instant one and would have jurisdiction to order a railroad to permit the construction of a grade crossing over and at its tracks which cross a city street—specifically, a New Orleans city street.

■ Initially, we find that there is no need for differentiating between a street and a highway. Both are passages between boundary lines, and we are not concerned with a question of dedication under a particular designation. See, LSA–R.S. 32:1 (17) and (54); Bomar v. City of Baton Rouge, 162 La. 342, 110 So. 497.

The Commission is an administrative board created by constitutional mandate. Article VI, Section 3, La.Const. of 1921. It is composed of three districts; Orleans Parish, which in reality is New Orleans, is one of the parishes located in the First District, and the Commission has jurisdiction over the parishes within the First District, including Orleans Parish. Gulf, Mobile and Ohio Railroad Company v. Louisiana Public Service Commission, 226 La. 952, 77 So.2d 548. The powers of the Commission are set forth in Article VI, Section 4, of the Louisiana Constitution of 1921, supra.

"The commission possesses no other power than that conferred upon it by the law of its creation, and under that law it has at the utmost only the power that is conferred in express terms or by necessary or fair implication. The accepted rule with regard to the construction of laws establishing private corporations has been stated by the Supreme Court of the United States as follows:

"'We take the general doctrine to be, in this country, that the powers of corporations organized under legislative statutes are such, and such only, as those statutes confer. Conceding the rule, applicable to all statutes, that what is fairly implied is as much granted as what is expressed, it remains that the charter of a corporation is the measure of its powers, and that the enumeration of those powers implies the exclusion of all others.' Thomas v. West Jersey R. Co., 101 U.S. 71, 25 L.Ed. 950.

" * * * " Western Union Telegraph Co. v. Railroad Commission of Louisiana, 120 La. 758, 45 So. 598.

Article VI, Section 4, of the Louisiana Constitution of 1921, supra, grants the Commission all necessary power and authority to supervise, govern, regulate and control all common carrier railroads. It also states that the Legislature may confer other powers on the Commission, and that this right is unlimited. LSA–R.S. 45:841 and LSA–R.S. 45:842, supra, provide for the power of the Commission to order the construction of grade crossings by railways and railroads.

" * * * Therefore, LSA–R.S. 45:-841 is not violative of Section 2 of Article 1 of the Constitution as the prohibition contained therein forbids only the taking of private property for public purposes without adequate

compensation. Implicit in the charter and franchise of the railroad company is the implied condition that it is granted subject to the right of the State, in the exercise of its police power, to establish and authorize new works necessary and subservient to the convenience and safety of its citizens which might cause damage to the property of the railroad. To this end, the State has the power to require of the railroad the uncompensated duty of constructing and maintaining all such crossings over its right of way as are reasonable and necessary for the public." Illinois Central R. Co. v. Louisiana Public Service Commission, 224 La. 279, 69 So.2d 43.

■ It is true that the UPT Agreement, supra, entered into between the City of New Orleans and the Railroad and others, provides for a series of overpasses and underpasses. The Commission, however, not being a party thereto, is not bound by this agreement. Cf. City of Shreveport v. Kansas City, S. & G. Ry. Co., 167 La. 771, 120 So. 290, 62 A.L.R. 1512; City of New Orleans v. New Orleans Waterworks Co., 142 U.S. 79, 12 S.Ct. 142, 35 L. Ed. 943. Likewise, the Commission cannot be deprived of the police power of the State vested in it by the Constitution. Cf. Art. XIX, Sec. 18, La.Const. of 1921; Department of Hwys. v. Southwestern Elec. Pow. Co., 243 La. 564, 145 So.2d 312; State ex

rel. Porterie v. Walmsley, 183 La. 139, 162 So. 826.

■ We find that the jurisdiction ratione materiae of the Commission to hear the cause entitled Board of Levee Commissioners of the Orleans Levee District v. New Orleans and Northeastern Railroad Company, bearing No. 9142 of the Docket of the Commission, and to make its own determination with respect to the grade crossing involved, is so clear that the citing of other authorities would be superfluous and would belabor the point.

The Home Rule Charter of the City of New Orleans, supra, and Act 159 of 1912, as amended, supra, vests the City of New Orleans with police power to protect the health, welfare, safety, and morals of its citizens. In the Resolution of September 19, 1963, supra, passed by the Commission Council of the City of New Orleans, a need to exercise the police power of the City of New Orleans was expressed. Nowhere in the authorities and law cited do we find any mention that the police power of the City of New Orleans is "sole" and "exclusive."

Herein, the City of New Orleans, in the attempted exercise of *its* police power, joined with the Levee Board in petitioning the Commission to exercise *the Commission's* police power for the purpose of granting relief to meet an alleged urgent and immediate public need arising from the

rapidly increasing bottleneck at the Seabrook Bridge. It stated that the bottleneck in traffic resulted from growing traffic and the fact that only one lane roadways were being used for both east and west bound traffic along Pontchartrain Lakeshore Drive.

Whether the Levee Board and the City of New Orleans are entitled to the relief they seek is not a matter for us to decide at this time; neither is it for us to now decide whether any contractual obligations between the City of New Orleans and the Railroad have been violated.

We conclude, as stated supra, that the Commission has jurisdiction ratione materiae to hear and determine the cause entitled Board of Levee Commissioners of the Orleans Levee District v. New Orleans and Northeastern Railroad Company, bearing No. 9142 of the Docket of the Commission. We also conclude that "sole" and "exclusive" jurisdiction does not lie with the City of New Orleans in the instant cause.

For the reasons assigned, the judgment of the trial court is affirmed. All costs to be paid by plaintiff.

SUMMERS, J., dissents and will assign reasons.

McCALEB, J., dissents, being of the opinion that the City of New Orleans has exclusive jurisdiction and power over its streets and that the Supreme Court of the United States correctly determined in Louisiana Public Serv. Comm. v. Morgan's Louisiana & T. R. & S. S. Co., 264 U.S. 393, 44 S.Ct. 358, 68 L.Ed. 756, that Act 132 of 1918, now LSA–R.S. 45:841, is inapplicable to the City.

SUMMERS, Justice (dissenting).

As I understand the majority opinion, the jurisdiction of the city of New Orleans over the grade crossing in the instant case is conceded. This authority is professed to exist under the city's "police power". La.Const. of 1921, art. 14, § 31.3, LSA and 1954 Home Rule Charter of the City of New Orleans; Act 159 of 1912. But, it is observed by the majority that this jurisdiction of the city over such things is not "sole" and "exclusive". This, I assume, permits the conclusion that the Commission also has jurisdiction and the majority opinion recognizes the authority of the Commission to exercise jurisdiction in this instance. This authority is said to be lodged in Article VI, Section 4, of the Louisiana Constitution of 1921 and LSA–R.S. 45:841–843.

I find no indication in these constitutional and statutory provisions of any intention to divide the authority concerning the regulation of grade crossings in the city of New Orleans. "There is no reason why such authority should ever be—and an obvious reason why it should never be—so divided;

for a division of it would only result in confusion, conflict of authority, and deadlocks." [1] Although the conflict does not exist here, as the city is apparently seeking to relinquish jurisdiction to the Commission in order to escape its contractual obligation with the railroad, the time of conflict under the majority opinion will undoubtedly come.

My view is that jurisdiction in this matter is exclusive either in the Commission or in the city, and that jurisdiction is to be determined by a construction of the pertinent authorities relied upon by all parties.

Since the enactment of the Lawrason Act in 1898, the State's municipalities have been specifically vested with jurisdiction and power enabling them to regulate the crossings of railroads over the municipal streets within their territorial limits.

The city of New Orleans has specific authority delegated to it to "exercise all powers, police or otherwise which, under the Constitution of the State of Louisiana, it will be competent for this charter specifically to enumerate" (Act 159 of 1912). Its Commission Council has the power "[t]o order the ditching, filling, opening, widening and paving of the public streets, and to regulate the grade thereof" and "[t]o authorize the use of the streets for * * * railroads * * * and to regulate the same."

Dart's Louisiana General Statutes, Sec. 6182 (1) (12).

Pursuant to the authority vested in the city by Section 22 of Article XIV of the Constitution of 1921, as amended by Act 551 of 1950, the 1954 Home Rule Charter of the City of New Orleans was adopted. In addition to conferring substantial additional powers upon the city, the Charter specifically provided that the city retained all rights, powers, privileges and authority that it had, or could claim, to govern its local affairs, property or government.

We note that the Commission has failed to exercise jurisdiction over crossings of streets in the city of New Orleans, either pursuant to LSA–R.S. 45:841–843 or otherwise. On the contrary, the city of New Orleans in this very case has assumed authority in its contract with the railroad to regulate this crossing. The Public Service Commission acknowledged it had no authority to approve or disapprove that agreement when the plans for the project were submitted by the city and the railroad to it for approval. See Order No. 4865 of June 1, 1948.

Under these circumstances, if the application of statutory or constitutional provisions are doubtful, an interpretation consistent with this prolonged refusal by the Commission to assume jurisdiction should be adopted. Roberts v. City of Baton Rouge,

1. State v. City of New Orleans, 151 La. 24, 35, 91 So. 533, 537 (1922).

236 La. 521, 108 So.2d 111 (1958); Jackson v. Coxe, 208 La. 715, 23 So.2d 312 (1945).

I recognize that the decisions of our Federal Courts are not binding upon us where the question involved is the interpretation of a state law, but I cannot disregard the sound reasons expressed by the federal court in Morgan's Louisiana & T. R. & S. S. Co. v. Louisiana Public Service Commission, D.C., 287 F. 390 (1923), 264 U.S. 393, 44 S.Ct. 358, 68 L.Ed. 756 (1924). There the court was considering the extent of the jurisdiction and authority of the Louisiana Public Service Commission to order the opening of a railroad crossing over "streets" in the city of New Orleans pursuant to Act 132 of 1918, the predecessor to LSA–R.S. 45:841–843. In denying that the Commission had jurisdiction to order the opening of crossings in the city of New Orleans, the district court said:

"Act 132 of 1918 has no application to the city of New Orleans.

\* \* \* \* \* \*

"If the jurisdiction of the commission to enter the order herein in controversy could be sustained, the right of the citizens of New Orleans to govern themselves in purely local matters would be seriously impaired. We can deduce no such intention from the provisions of the Constitution of 1921, or any other law of Louisiana. It follows that the commission was without jurisdiction or

authority to make the order complained of."

Subsequently, on appeal, the United States Supreme Court affirmed this decision saying:

"The broad language of section 284, Constitutions of 1898 and 1913, was not regarded as sufficient to empower the Railroad Commission to require carriers to construct public crossings over their lines. To meet this situation and provide relief in the parishes the Act of 1918 was passed; \* \* \*.

\* \* \* \* \* \*

"Unless and until otherwise advised by the Supreme Court of Louisiana, we must conclude that the general control of its own streets is an ordinary governmental function of the City of New Orleans.

"It would require more definite language than we find in the Constitution of 1921, or in Gulf, C. & S. F. Ry. [Co.] v. [Louisiana] Public Service Commission [151 La. 635, 92 So. 143], to convince us that the commission has power to assume control over all those streets within New Orleans which approach or cross railroad tracks, and to disregard the solemn contracts of the municipality with respect thereto."

The basic supervisory and regulatory power of the Commission is conferred by

Article VI, Section 4, of the Louisiana Constitution of 1921. This constitutional enactment does not either expressly or impliedly confer upon the Commission power or authority to order the opening of railroad crossings over public roads or streets. The legislature realizing this deficiency has retained LSA-R.S. 45:841-843 to supply this authority. This does not, however, as I have shown, apply to streets or roads within municipalities.

It is conceded, as it must be, that Article XIV, Section 31.3 of the constitution grants the power to the city of New Orleans to regulate grade crossings. The contention, however, is that this power is not exclusive and the state-wide power of the Public Service Commission is not superseded thereby. Such an untenable position is contrary to the fundamental principle of statutory construction that the last expression on a subject should prevail. Article XIV, Section 31.3, having been enacted after Article VI, Section 6, which defines the authority of the Commission, should prevail in case of conflict.

Because of the authorities cited and the general rule of law that municipal corporations have "control of their own streets, with the right to fix grades, provide for payment, regulate their use by steam and street railroads, and determine what structures in the nature of railroad tracks and appurtenances, telegraph poles, etc., may be erected and maintained on said streets," as one of their ordinary governmental functions, Morgan's Louisiana & T. R. & S. S. Co. v. Louisiana Public Service Commission, supra, I cannot subscribe to the opinion of the majority. It is difficult to accept the conclusion that the city of New Orleans has less power in this respect than municipal corporations generally and less than all of the municipalities in this State organized under the Lawrason Act. I cannot agree that it was intended that Louisiana's largest city alone be so restricted in this purely local function. The authorities relied upon do not say so; it is unreasonable and unrealistic to ascribe such a meaning to them.

I respectfully dissent.