**NEW ORLEANS TERMINAL COM-PANY, Plaintiff,**

and

**Texas & New Orleans Railroad Company, Intervenor,**

v.

**Charles W. SPENCER, Beauregard H. Miller, Jr., A. Russell Roberts, Robert J. Duplantis, Frederick J. R. Heebe, John G. Fitzgerald, William J. Dwyer, Vernon C. Haynes, William S. Coci, Philip B. Smith and Frank H. Langridge, Defendants.**

Civ. A. No. 9125–B.

United States District Court
E. D. Louisiana,
New Orleans Division.

Oct. 28, 1965.

Walter J. Suthon, Jr., Malcolm L. Monroe, Benjamin R. Slater, Jr., J. Raburn Monroe, Monroe & Lemann, New Orleans, La., and Arnold McKennon, Gen. Sol. for Southern Railway System, Washington, D. C., for plaintiff, New Orleans Terminal Co.

Harry McCall, Jr., William E. Crawford, Chaffe, McCall, Phillips, Burke, Toler & Hopkins, New Orleans, La., for intervenor, Texas & New Orleans R. Co.

Nathan Greenberg, Gilbert P. Cohen, Greenberg & Cohen, Gretna, La., special counsel for defendant members of Jefferson Parish Council.

Frank H. Langridge, Jefferson Parish Dist. Atty., in pro. per.

Samuel S. Dalton, New Orleans, La., for defendant William S. Coci.

Waverly A. Henning, Asst. Dist. Atty., Jefferson Parish, La., Harold Kytle, Louis G. DeSonier, Jefferson Parish Atty., George C. Stringer, Jr., and F. M. Lob, Asst. Parish Attys., Jefferson Parish, La., for defendants.

FRANK B. ELLIS, District Judge.

Over a period of years the citizens and Council of Jefferson Parish, Louisiana, have been seeking removal of several

New Orleans Terminal Company railroad grade crossings in highly populated areas of Metairie, Louisiana. Having failed in repeated attempts to amicably eliminate the crossings, or at least alleviate the noise, inconvenience and hazards incidental to operations conducted on the tracks, the Jefferson Parish Council adopted Ordinance No. 3911, supplemented by Emergency Ordinance No. 3967, which together require immediate removal of the crossings and provide criminal penalties for wilful violations of the removal ordinance.

In an effort to derail the Council, this action for declaratory judgment was instituted by the New Orleans Terminal Company (NOTC) to have enforcement of the ordinances enjoined and the ordinances themselves declared unconstitutional as being, among other things, in contravention of the Commerce clause in the United States Constitution. The Council counterclaimed for a judgment declaratory of the ordinances' constitutionality as valid exercises of its own police power. The trial of all issues was held to the Court without a jury.

*I. Background*

The situation giving rise to this litigation had its genesis in the mid-1890's when the New Orleans & Western Railroad, plaintiff's predecessor, petitioned the Jefferson Parish Police Jury for permission to run its tracks through a then sparsely populated area of the Parish and across five public ways. These five crossings were to be at, going generally from west to east, Shrewsbury Road, Harlem Avenue, Labarre Road, Metairie Road and the "upper Protection Levee". This request was granted in an ordinance adopted October 17, 1895. (Appendix A.)

A single track line, referred to herein as Track A, was thereafter constructed

in Jefferson Parish, and today constitutes the western three-mile portion of what is called the "Back Belt" line through the New Orleans metropolitan area. This "Back Belt" line runs from a section known as Shrewsbury on the west, through New Orleans to an eastern terminus at Port Chalmette in Saint Bernard Parish for an overall length of approximately sixteen miles, and connects most of the railroads serving New Orleans, thereby providing a means for the transfer of cars and trains from one railroad to another.[1]

In 1942, during the emergency occasioned by World War II, plaintiff petitioned the Jefferson Parish Police Jury for permission to construct six additional track crossings at grade "in order to move the National Defense materials and its other freight and business expeditiously." Following a special Parish Committee's study and report (Appendix B) this request was granted in Ordinance No. 812, adopted December 9, 1942. (Appendix C.)

Permission to establish these six crossings enabled plaintiff to construct a track parallel with and immediately adjacent to a portion of Track A. The second track, referred to herein as Track B, extended from just west of Shrewsbury Road, across Shrewsbury Road, Airline Highway and Labarre Road for a distance of 11,816 feet to a point just west of Metairie Road. At both ends Track B was connected with Track A, and at several points along its length it was also connected to Track A with crossovers.

The three other crossings permitted under Ordinance No. 812 would have enabled plaintiff to install three additional "short" tracks from just west of Shrewsbury Road, across Shrewsbury Road, to a point southwest of the Airline Highway. Only one of these "short" tracks

---

1. The systems so connected are the Illinois Central Railroad, Texas & Pacific—Missouri Pacific Terminal Railroad of New Orleans, Texas & New Orleans Railroad (Southern Pacific Railroad), Louisiana & Arkansas Railway (Kansas City Southern Lines), New Orleans Union Passenger Terminal, Louisville & Nashville Railroad, New Orleans & Northeastern Railroad (Southern Railway System), Public Belt Railroad, Louisiana Southern Railway, and the Gulf, Mobile & Ohio Railroad.

was constructed, however, and is referred to as Track C. In schematic form, the tracks and crossings described are illustrated in this diagram:

Diagram 1

TRACKS: A – original, 1895.
 B – second track, 1942.
 C – short track, 1942.

[not to scale]

CROSSINGS: 1 – Track B–Shrewsbury Road.
 2 – Track B–Airline Highway,
 (see note 21, infra).
 3 – Track B–Labarre Road.
 4 – Track C–Shrewsbury Road.

The legality of the original mainline track, Track A, and its crossings is not at issue in the instant suit.

In the mid-1950's then, Jefferson Parish voters approved a change in their form of local government from the police jury type to the present president-council system. Since that time the parish as a whole has experienced tremendous growth residentially, industrially and commercially, with residential development in proximity to New Orleans especially prominent. Metairie, Louisiana, is one of those residential communities and now finds itself bisected by plaintiff's railroad tracks.

Complaints from citizens and the Jefferson Parish Council have been directed not towards the mere presence of the tracks, but rather towards the use plaintiff is making of those tracks. Such complaints are summarized and enumerated in Ordinance No. 3911, adopted by the Council on December 29, 1958. (Appendix D.) The NOTC adamantly refused to remove the crossings and has failed to alter operations sufficiently to satisfy irritated residents. The citizens' and council's core of opposition centers on plaintiff's utilizing the tracks as a 24-hour marshaling yard for switching operations, thereby:

a) causing property damage and mental anguish to residents from the concussion and noise incident to switching operations, including the parking of mechanized refrigerator cars and cars full of live cattle, and

b) potentially endangering property and life by the parking and switching of tank cars containing explosive and combustible substances, as well as by blocking crossings which hinder fire, police and civil defense department operations.

After setting forth these grievances, Ordinance No. 3911 repealed the 1942 Ordinance, No. 812, which in effect approved construction of the two additional tracks by permitting the grade crossings, and authorized parish officials to proceed with actions necessary to effect removal of those crossings. Emergency Ordinance No. 3967, adopted some nine

weeks later on March 5, 1959, established criminal penalties for violations of Ordinance No. 3911. (Appendix E.)

Armed with these two new ordinances, parish authorities in May of 1959 commenced intermittently halting trains on Track B and Track C, at times arresting train crews, and actually instituting criminal prosecutions for violations of the ordinances. At that juncture plaintiff filed the present declaratory judgment suit to have the two ordinances declared unconstitutional as an improper burden on interstate commerce and violative of the Commerce clause, among other grounds. Pursuant to this Court's suggestion, the parties have commendably agreed to a "truce" pending legal determination of the matters at issue.[2]

2. This entailed restraint mainly on the part of Jefferson Parish officials. All parties, in the meantime, are continuing in their efforts to jointly adjust their differences, as witnessed by the formation of a committee to study the problems and recommend solutions:

"*Jeff, Railroads to Make Study*

"Officials of Jefferson Parish and of railroads have agreed to organize a committee to study problems and suggest remedies for long-standing conflicts between railroads and Jefferson residents.

"Naming the committee was suggested by Councilman Jacob J. Sciambra, at a 'clear-the-air' meeting of officials held Tuesday.

"Council Chairman Charles J. Eagan, Jr., said it is the intent of the council to seek a feasible approach to the problems and to find a reasonable solution. He said basic rights of people living near railroad tracks are being jeopardized, and the parish must face up to that problem.

\* \* \* \* \*

"H. C. Mauney, vice-president of the New Orleans Terminal Company, said a number of situations have been solved by railroads during the years, but that he feels the principal solution to existing problems is construction of grade crossings.

"Parish President Thomas F. Donelon, said, however, the amount of participation in the cost of constructing grade crossings by the railroads in earlier proposals was too low and 'out of line' with parish needs.

\* \* \* \* \*

## II. Parties

The plaintiff here, New Orleans Terminal Company, is a Louisiana corporation controlled by the Southern Railway System. While plaintiff owns tracks only in the New Orleans area, the overall Southern system extends from Washington, D. C., Cincinnati, Ohio, and East St. Louis, Illinois on the north to the Gulf of Mexico on the South, and from the Atlantic Ocean on the east to the Mississippi River on the west.[3] The system comprises about 4600 miles with substantial track mileages located in twelve states.

Prior to the filing of this action, on September 1, 1953, plaintiff entered into a contractual operating agreement with

"Charles F. O'Doniel, Jr., director of the regional planning commission of the New Orleans area, said it is hoped to have a design study completed by early next year as a preliminary to an overall plan concerning railroads. Once this design study is completed, he said, the project can be worked out on a priority basis." The Times Picayune, New Orleans, Louisiana, Thursday, March 25, 1965, Section 2, Page 8.

3. The Fifth Circuit Court of Appeals has recently had occasion to describe the nature of this system:

"The Southern Railway System, a noncorporate entity, is the name given to the sixty-member 'family' which includes the Southern Railway Company, the Cincinnati-New Orleans and Texas Pacific Railroad Company, the Alabama Great Southern Railroad Company, the Carolina Northwestern Railroad Company, the New Orleans and Northeastern Railroad Company, and a good many smaller lines which were described by the assistant comptroller of Southern as 'class two carriers'. Although the executive offices of the various railroads are paid by checks issued by Southern, the entire payroll is pooled, prorated and 'participated in by the affiliated lines'.

"Although the constituent members of the Southern Railway System constitute a 'family', it is plain from the record that the members of the family are separate entities." New Orleans & N. E. R. Co. v. Hewett Oil Co., Inc., 341 F.2d 406, 408 (5 Cir. 1965).

the Texas & New Orleans Railroad, a Texas corporation operating a railroad between El Paso, Texas and New Orleans, whereby the T & NO was granted the right to operate its trains over that portion of the "Back Belt" line here at issue. On the basis of that right in contract, and even though it was neither an indispensable nor necessary party, the T & NO was permitted to intervene as an additional party plaintiff.[4] Intervenor has not been named in defendants' counterclaim, filed subsequent to the intervention, but as a practical matter, any ruling on that counterclaim will affect not only the tracks owned by plaintiff, but also intervenor's use of those tracks. Intervenor apparently proceeded with that understanding.

■ The defendants have been sued as individuals and in their respective representative capacities as elected officials of Jefferson Parish. Shortly after suit was filed a parish election was held and several of the original defendants were not returned to office. By motion and order, and pursuant to the 1960 requirements of Rule 25(d), F.R.Civ.P., 28 U.S.C.A., the newly elected officials were substituted and the original defendants not re-elected were dismissed. Another parish election intervened between the trial of this case and the filing of this opinion, that is, while the case was under advisement to the Court. Those officials elected in 1964 have not been formally substituted as parties defendant by plaintiff, nor have they been served. Whereas such a formal motion was mandatory in order to maintain this action following the 1960 election,[5] an amendment to Rule 25(d), effective July 19, 1961, renders the substitution of a newly elected official 'automatic' in actions pending against his predecessor.[6] By operation of Rule 25(d), then, the proper parties defendant are presently before this Court. All of the officials involved in this progression are listed in Appendix F.

*III. The Merits.*

■ Federal question jurisdiction rests on plaintiff's allegations that the parish ordinances at issue impinge upon the Commerce clause of the U. S. Constitution, that the amount in controversy exceeds $10,000 exclusive of interest and costs, and that the constitutional issues are substantial. 28 U.S.C.A. § 1331(a). See Siler v. Louisville & Nashville R. Co., 213 U.S. 175, 190–192, 29 S.Ct. 451, 53 L.Ed. 753 (1909). Furthermore, an interpretation and application of paragraphs 18 and 22 of Section 1 of the

4. The motion of the Texas & New Orleans Railroad Company to intervene as an additional party plaintiff was granted on December 31, 1959 by Honorable Herbert W. Christenberry, Chief Judge of this Court. Although written reasons were not assigned, it is patent that sufficient supporting authority for the ruling is found in the only case briefed by intervenor, Ford Motor Co. v. Bisanz Bros., Inc., 249 F.2d 22 (8 Cir. 1957). Opposition briefs were concerned only with the merits of the intervening petition and not with any legal or equitable considerations incident to its mere filing.

5. The motion of plaintiff to substitute successors in office as parties defendant pursuant to Rule 25(d), F.R.Civ.Pr., 28 U.S.C.A., was granted January 4, 1961. It had been held by several courts that the need for such a substitution was mandatory. See State of Oklahoma ex rel. Vassar v. Missouri-Kansas-Texas R. Co., 29 F.Supp. 968 (D.Okl.1939), affirmed sub nom. State of Oklahoma ex rel. McVey v. Magnolia Petroleum Co., 114 F.2d 111 (10 Cir. 1940), overruled in part, Northwestern Lumber & Shingle Co. v. United States, 170 F.2d 692, 694 (10 Cir. 1948); Rossello v. Marshall, 12 F.R.D. 352 (S.D. N.Y.1952). That rule was considered extremely harsh and ultimately was amended. See the 1961 amendment Notes of Advisory Committee on Rules, Rule 25 (d), F.R.Civ.P., 28 U.S.C.A. (1964 Supp. at pp. 68–69), and 2 Barron & Holtzoff, Federal Practice and Procedure, §§ 625–626 (Wright ed.).

6. Rule 25(d), F.R.Civ.P., 28 U.S.C.A. now provides:

"(1) When a public officer is a party to an action in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and his successor is automatically substituted as a party. * * *"

Interstate Commerce Act,[7] a federal law, looms large as the heart of the dispute. Finally, and in addition, since this declaratory judgment action [8] arises under the Interstate Commerce Act, an "Act of Congress regulating commerce", jurisdiction to hear this matter is also validly predicated on 28 U.S.C.A. § 1337. See Detroit & M. Ry. Co. v. Boyne City, G. & A. R. R. Co., 286 F. 540, 543 (D.C.E.D. Mich.1923). The intervention and counter-claims base jurisdiction on the same grounds. Thus, even though none of the parties contested this Court's jurisdiction to hear the matter, we conclude that the jurisdictional allegations of all the parties are well founded.

a. *Authority of Jefferson Parish*

An issue which merits consideration at this point is whether Jefferson Parish has been delegated authority by the State of Louisiana to order removal of railroad tracks crossing a public way within the parish, that is, whether ordinances No. 3911 and No. 3967 were not "ultra vires" acts of the Parish Council. Plaintiff raised this issue in Article X of the complaint, and intervenor did likewise in Article IX(c) of the intervening petition.[9] While those parties have not pursued the point with the degree of diligence demonstrated in other areas of the case, if at all, this Court hesitates to consider the issue "abandoned" [10] and hence proceeds with its resolution.

The American form of democracy is founded on the cardinal principle that government of the people emanates from the people and rests initially in the State, from whence flows delegated power to govern within the scope of the power so delegated. In this respect the United States Constitution represents a delegation by the several States of certain enumerated powers to the Federal government, and, similarly, cities, parishes and other quasi-legislative bodies regularly receive specific powers to govern. Consequently, the Jefferson Parish Council can exercise only those powers delegated to it by the State of Louisiana. State v. Jordan, 207 La. 78, 20 So.2d 543, 545 (1944).

In providing for the establishment of "home rule" in Jefferson Parish, Article 14, § 3(c) (2) of the Louisiana Constitution, permitted a "Plan of Government" to be adopted subject to "the provisions of the Constitution and laws of this State with respect to the powers and functions of local government." [11] Pursuant to that authority the people of Jefferson Parish adopted a 'Council-Parish President' plan of government which lists the express powers of the parish in sixteen sub-paragraphs of Article 1, Section 1.01. Especially noteworthy here are sub-paragraphs three through five of the charter which specify general police powers regarding streets, traffic and law enforcement:

"(3) Provide and maintain streets, highways, bridges, tunnels, and off-street parking facilities.

"(4) Prepare, enact and enforce plans for the direction and control of traffic; and install, maintain, and operate traffic control devices on arterials.

"(5) Provide law enforcement, police protection, and traffic control services; * * *".

7. 49 U.S.C.A. § 1(18) and § 1(22).

8. Declaratory judgments are authorized under 28 U.S.C.A. §§ 2201–2202. There here exists an "actual controversy". Compare, Public Service Commission of Utah v. Wycoff Co., Inc., 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952).

9. The intervention, for example, alleges that:
" * * * the said ordinance is void, null and invalid as * * * (c) an ultra vires act of the Jefferson Parish Council in attempting to remove the rails of the track in question from various crossings which are part of the State Highway System; * * *".

10. See Peterson v. SS Wahcondah, 331 F. 2d 44 (5 Cir. 1964), affirming in part but remanding 216 F.Supp. 642 (E.D.La. 1963).

11. LSA–Const. Art. 14, § 3(c) (2). This provision was adopted November 6, 1956 as Added Acts 1956, No. 631.

Section 1.01 further states that "all implied powers necessary and proper for putting [the listed powers] into effect" shall be included within the authority assumed under the Charter. Adopted in compliance with the Louisiana Constitution,[12] this charter effectively delegates its stated powers to the Parish.

There exists little doubt that the regulation of railroad crossings falls within the broad ambit of govermental police power. New Orleans & N. E. R. R. Co. v. Louisiana Public Service Comm., 246 La. 207, 164 So.2d 300, 311 (1964); 74 C.J.S. Railroads § 142, p. 586. Despite a Constitutional prohibition against total abdication of the police power, LSA–Const. Art. 19, § 18, the State possesses authority to delegate this power. Fernandez v. Alford, 203 La. 111, 13 So. 2d 483 (1943). An express delegation of police power control over railroad operations has been effected in favor of the Louisiana Public Service Commission through Article 6, § 4 of the State Constitution.[13] This express grant does not, however, pre-empt control in favor of that Commission as to police power regulation of railroad crossings nor prevent the State from delegating those powers concurrently to another governmental body. See LSA–Rev.Stat. 33:403(2). The maintenance of streets includes grade crossings; the blockage of streets by trains affects traffic control; and the refusal to comply with local ordinances requires law enforcement. Concluding then, since plaintiff did not prove otherwise, that Ordinances No. 3911 and No. 3967 constitute an exercise of the power to maintain streets, control traffic and generally enforce laws, those ordinances are not "ultra vires". They validly emanate from the delegation of police powers contemplated in LSA–Const. Art. 14, § 3(c) (2) and the Parish Charter adopted in accordance therewith.

b. *Contract Rights.*

Relying on the contract clause of the United States Constitution,[14] Article XIX of the complaint[15] raises the further issue of whether the present actions of the Jefferson Parish Council impinge upon a contractual right created in favor of the railroad by the 1942 ordinance which permitted construction of the crossings. In resolving this issue little need be added to the treatment accorded a legally analogous problem by the Louisiana Supreme Court in a case where a contractual agreement concerning railroad crossings conflicted with an attempted exercise of delegated police power. There the Court noted decisively that the governmental body "cannot be deprived of the police power of the State vested in it by the Constitution." New Orleans & N. E. R. R. Co. v. Louisiana Public Service Comm., 246 La. 207, 164 So.2d 300, 311 (1964). This proposition holds true even where the governmental authority asserting its police power was a party to the contract.

12. Id., § 3(c) (1). Plaintiff does not attack the charter's validity.

13. LSA–Const. Art. 6, § 4, as amended by Acts 1964, No. 531, adopted November 3, 1964.

14. U.S.C.A. Const. Art. 1, § 10, cl. 1.

15. "XIX THE ORDINANCE IMPAIRS THE OBLIGATION OF A CONTRACT AND DESTROYS A VESTED RIGHT.
"Ordinance No. 812 is an absolute grant of a vested right. The words of granting are unqualified and unlimited. They contain no qualification or limitation.
"Upon placement of the railroad tracks at, upon and over the three railroad crossings specified in Ordinance No. 812, plaintiff accepted the grant of the privilege or franchise embodied in said Ordinance, thereby acquiring a vested and impliedly contractual right with the Parish of Jefferson to continue to maintain and use this trackage over these crossings.
"The attempt by Ordinance No. 3911, as amended by Emergency Ordinance No. 3967, to impair and destroy the obligation of this implied contract, and to divest these vested rights, is in violation of the provisions of the Constitution of the United States, and particularly the clause prohibiting the impairment by a State of the obligations of a contract (Paragraph 1 of Section 10 of Article (I) X of the Constitution of the United States)."

"It is elementary and fundamental that the state's police power cannot be bartered away *by contract;* and that the clauses of the Constitutions, guaranteeing due process of law and vested or contract rights against impairment, have always yielded to its proper exercise. [U. S. Supreme Court and other citations omitted.]" (Emphasis theirs.) State ex rel. Porterie v. Walmsley, 183 La. 139, 162 So. 826, 837 (1935).

The Parish's police power would therefore override any vested or contract right which the railroad might have acquired through enactment of Ordinance No. 812 in 1942.

c. *Property Rights.*

One other issue raised in plaintiff's pleadings, but also not actively pursued, concerns the railroad's use of its right of way owned by it in "fee simple". Article XX of the complaint [16] alleges that the enforcement of Ordinance No. 3911 would "interfere with the tracks of plaintiff at this State Highway crossing whereat the land on which the railroad tracks and the highway are located is the property of plaintiff itself." Here again though, the State's police powers overridingly control.

"The fact that the company holds an unencumbered paper title to the land which it uses as its right of way does not warrant the conclusion that it has a perfect ownership as defined by Article 490 of the LSA–Civil Code. On the contrary, by the very nature of the business in which it engages, the right of way is impressed with a public interest and is declared to be a public highway by Section 3 of Article 13 of our Constitution. * * * Implicit in the charter and franchise of the railroad company is the implied condition that it is granted subject to the right of the State, in the exercise of its police power, to establish and authorize new works necessary and subservient to the convenience and safety of its citizens which might cause damage to the property of the railroad." Illinois Central R. R. Co. v. Louisiana Public Service Comm., 224 La. 279, 69 So.2d 43, 46 (1953). See also Shreveport Traction Co. v. Kansas City, S. & G. Ry. Co., 119 La. 759, 44 So. 457, 463 (1907).

Considering a railroad's asserted contract and property rights in juxtaposition with a State's police powers, Mr. Justice Holmes succinctly set forth the same principles indicated herein when he wrote for the U. S. Supreme Court:

"the authority of the railroads to project their moving masses across thoroughfares must be taken to be subject to the implied limitation that it may be cut down whenever and so far as the safety of the public requires." Erie R. R. Co. v. Board of Public Utility Commissioners, 254 U.S. 394, 410, 41 S.Ct. 169, 171, 65 L.Ed. 322 (1921).

Ordinances No. 3911 and No. 3967 being valid, *prima facie* exercises of police pow-

16. "XX ORDINANCE NO. 3911 ATTEMPTS TO PREVENT PLAINTIFF FROM USING ITS OWN PROPERTY FOR LEGITIMATE PURPOSES OF ITS RAILROAD BUSINESS.

"Plaintiff is the owner of the fee simple title to the land whereon the Airline Highway cross [sic] the tracks of plaintiff, by title and ownership long antedating the laying out and construction of the Airline Highway by the State of Louisiana. This land owned by plaintiff is subject to a servitude or easement granted by the plaintiff to the Department of Highways, State of Louisiana, or the legal predecessor thereof, for the construction of the Airline Highway across the property and tracks of plaintiff. The additional track at this crossing laid by plaintiff around 1942 and 1943, and utilized ever since by plaintiff in its railroad operations, is located on the property of plaintiff. The Jefferson Parish Council of Jefferson Parish can have no pretense of any right or authority to interfere with the tracks of plaintiff at this State Highway crossing whereat the land on which the railroad tracks and the highway are located is the property of plaintiff itself." An underpass carries Airline Highway past the tracks today. See note 21, infra.

er in the public interest, the railroad's asserted contract and property rights cannot be permitted to interfere.

#### d. *Interstate Nature of Tracks*

Turning then to those matters most strenuously urged by the parties, it is apparent plaintiff's major attack centered on proving that authority to abandon Track B or Track C, or both, was vested solely in the Interstate Commerce Commission, and not in the Jefferson Parish Council, by showing that those tracks accommodated traffic moving principally in interstate commerce. Plaintiff's exhibits P–10 and P–11 reveal that for the weeks of August 25–31, 1963, and March 15–21, 1964, the total numbers of railroad cars handled via Shrewsbury over plaintiff's Tracks A, B and C were 6670 and 6718, respectively. These exhibits further indicate that during one of those weeks 3633 cars were moving interstate, 412 intrastate, and 2625 were "empties", and that during the other week the corresponding figures were 3388 interstate, 408 intrastate and 2922 "empties". Based on this two-week sample supplied by plaintiff and not objected to by defendants, 7021 of the total 13,388 cars analyzed were moving in interstate commerce. In other words, 52.4% of the cars handled on these tracks were considered directly involved in interstate movements.[17]

Considering next plaintiff's exhibit P–7, which lists the yearly totals of railroad cars handled over those tracks from 1940 through 1963, it is possible to calculate an average for the most recent ten years so as to apply the above percentage to that figure and obtain an estimate of the interstate cars that pass over those tracks each year. The ten-year average derived from Exhibit P–7 reveals that 364,216 cars per year are involved, and by applying the percentage to that figure it is statistically estimated that an annual average of 190,849 interstate cars use the tracks.

The record and exhibits provide no direct or statistical data for ascertaining the number of interstate cars that traverse Track B, as distinguished from those using Track A, for any given period of time, but the direct examination of Mr. E. L. Dunbar, Superintendent of the New Orleans Terminal Company, shows that "generally speaking," traffic on Track A moves "from the east to the west" and on Track B "from the west to the east". (Tr. p. 99) Those being the only two tracks over which the total number of cars could travel, it can reasonably be assumed that approximately one-half of the annually handled interstate cars use Track B. Breaking this down further, on the average, about 261 interstate cars per day would be handled via Track B.[18] This interstate traffic clearly constitutes a "substantial portion" of the business carried over Track B.

#### e. *Congress' Commerce Power*

The power of Congress to regulate and protect "commerce" emanates from Article 1, § 8, clause 3 of the United States Constitution. In protecting interstate commerce Congress has extended its shield into many areas which on their face appear less directly connected with "commerce" than Track B. For example, the U. S. Supreme Court recently declared the regulation of local public accommodations through the 1964 Civil Rights Act to be a valid exercise of Congress' power to protect "commerce", Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), and in so doing listed numerous examples of other valid Congressional exercises of that power.[19] From those examples it

---

17. The "empties" could conceivably be in interstate commerce, but since plaintiff has not even contended that to be the fact, much less proved it, the Court employed only those figures labelled "interstate" in computing the percentage.

18. This figure is derived by taking one-half of the average annual total of inter-

state cars moving over both tracks and dividing by the number of days in a year:

$$\frac{1}{2} \times \frac{190,849}{365} = 261.44$$

19. "The same interest in protecting interstate commerce which led Congress to deal with segregation in interstate carriers

stands evident that Congress could validly regulate Track B through the commerce powers.

The question remains, however, whether Congress has decided to regulate this area, for it is equally evident that:

"the grant of power to Congress by the Commerce Clause did not wholly withdraw from the states the authority to regulate the commerce with respect to matters of local concern, on which Congress has not spoken. * * * even though the exercise of those powers may materially affect [commerce]." Parker v. Brown, 317 U.S. 341, 360, 63 S.Ct. 307, 318, 87 L.Ed. 315 (1943).[20]

Through the medium of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., Congress has spoken generally in the area of railroad regulation and, clearly, in this area Congress enjoys a wide latitude in defining and distributing the power to regulate interstate commerce.

"It may either *permit the states to regulate commerce in a manner which would otherwise not be permissible,* [citations omitted], or exclude state regulation even of matters of peculiarly local concern which nevertheless affect interstate commerce. [citations omitted]." (Emphasis supplied.) Southern Pacific Co. v. State of Arizona ex rel. Sullivan, 325 U.S. 761, 769–770, 65 S.Ct. 1515, 1520–1521, 89 L.Ed. 1915 (1945).

As a result, presence of the Interstate Commerce Act here transforms any anticipated constitutional commerce clause problems instead to questions of legislative interpretation.

f. *Interstate Commerce Act*

By repealing Ordinance No. 812 of 1942 and requiring physical removal of the track crossings constructed pursuant to that ordinance,[21] the Jefferson Parish Council has, in effect, ordered the New Orleans Terminal Company to

and the white slave traffic has prompted it to extend the exercise of its power to gambling, Lottery Case (Champion v. Ames), 188 U.S. 321 [23 S.Ct. 321, 47 L.Ed. 492] (1903); to criminal enterprises, Brooks v. United States, 267 U.S. 432 [45 S.Ct. 345, 69 L.Ed. 699] (1925); to deceptive practices in the sale of products, Federal Trade Comm. v. Mandel Bros. Inc., 359 U.S. 385 [79 S.Ct. 818, 3 L.Ed.2d 893] (1959); to fraudulent security transactions, Securities & Exchange Comm. v. Ralston Purina Co., 346 U.S. 119 [73 S.Ct. 981, 97 L.Ed. 1494] (1953); to misbranding of drugs, Weeks v. United States, 245 U.S. 618 [38 S.Ct. 219, 62 L. Ed. 513] (1918); to wages and hours, United States v. Darby, 312 U.S. 100 [657, 61 S.Ct. 451, 85 L.Ed. 609] (1941); to members of labor unions, National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1 [57 S.Ct. 615, 81 L.Ed. 893] (1937); to crop control, Wickard v. Filburn, 317 U.S. 111 [63 S. Ct. 82, 87 L.Ed. 122] (1942); to discrimination against shippers, United States v. Baltimore & Ohio R. Co., 333 U.S. 169 [68 S.Ct. 494, 92 L.Ed. 618] (1948); to the protection of small business from injurious price cutting, Moore v. Mead's Fine Bread Co., 348 U.S. 115 [75 S.Ct. 148, 99 L.Ed. 145] (1954); to resale price maintenance, Hudson Distributors, Inc. v.

Eli Lilly & Co., 377 U.S. 386 [84 S.Ct. 1273, 12 L.Ed.2d 394] (1964), Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384 [71 S.Ct. 745, 95 L.Ed. 1035] (1951); to professional football, Radovich v. National Football League, 352 U.S. 445 [77 S.Ct. 390, 1 L.Ed.2d 456] (1957); and to racial discrimination by owners and managers of terminal restaurants, Boynton v. Com. of Virginia, 364 U.S. 454 [81 S.Ct. 182, 5 L.Ed.2d 206] (1960)." 379 U.S. at pp. 256–257, 85 S.Ct. at p. 357.

20. See also, South Carolina State Highway Dept. v. Barnwell Bros. Inc., 303 U.S. 177, 184–185, 625, 58 S.Ct. 510, 82 L.Ed. 734 (1938); Union Brokerage Co. v. Jensen, 322 U.S. 202, 209–210, 64 S.Ct. 967, 88 L.Ed. 1227 (1944); Southern Pacific Co. v. State of Arizona ex rel. Sullivan, 325 U.S. 761, 767–769, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945); Railway Express Agency Inc. v. People of State of New York, 336 U.S. 106, 111, 69 S.Ct. 463, 93 L.Ed. 533 (1949).

21. Of the four crossings eventually constructed as a result of Ordinance No. 812 of 1942, only three need concern this Court and the parties in this action, those being Track B crossings over Shrewsbury Road and Labarre Road, and the Track C crossing over Shrewsbury Road, crossings 1, 3 and 4. The other one, crossing 2,

"abandon" a portion of a line of its railroad.[22] Two paragraphs of the Interstate Commerce Act consider "abandonments". The first, § 1(18), requires, in all-inclusive terms, that no abandonment of "all or any portion of a line of railroad" can be effected without approval by the Interstate Commerce Commission.

"§ 1(18). * * * [n]o carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment. * *" 49 U.S.C.A. § 1(18).

The other paragraph, § 1(22), states an exception to this general rule,[23] by providing that a railroad's "abandonment of spur, industrial, team, switching, or side tracks" need not receive Commission approval.

"§ 1(22). * * * The authority of the Commission conferred by paragraphs (18) to (21) of this section, both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching, or side tracks, located or to be located wholly within one State * * *". 49 U.S.C.A. § 1(22).

By virtue of paragraph 22 then, Congress permits the railroads and, *ipso facto*, state and local governments, to control abandonments of spur, industrial, team,

switching, and side tracks located wholly within one State by considering those abandonments to be "local activities" not subject to Commission control despite their possible effect on interstate commerce. City of Yonkers v. United States, 320 U.S. 685, 690, 64 S.Ct. 327, 88 L.Ed. 400 (1944); Western & Atlantic R. R. v. Georgia Public Service Commission, 267 U.S. 493, 497, 45 S.Ct. 409, 69 L.Ed. 753 (1925) [85% of business done on local "side track" was interstate commerce].

In cases where the Interstate Commerce Commission has not made any determination that the abandonment of a portion of a line of railroad comes within or without the paragraph 22 exception, it remains incumbent on the court to resolve this jurisdictional "mixed question of fact and law."

"As stated by Mr. Justice Brandeis in United States v. [State of] Idaho, 298 U.S. 105, 109 [56 S.Ct. 690, 80 L.Ed. 1070], the determination of what is included within the exemption of § 1(22) involves a 'mixed question of fact and law.' Congress has not left that question exclusively to administrative determination; it has given the courts the final say. Id., 298 U.S. page 109 [56 S.Ct. 690.] It is settled that the aid of the Commission need not be sought before the jurisdiction of a court is invoked to enjoin violations of the provisions in question." City of Yonk-

---

Track B-Airline Highway, was eliminated by construction of an underpass grade separation incidental to completion of the Lake Pontchartrain Causeway and the extension of Causeway Boulevard, formerly Harlem Avenue, in the mid-1950's. Two other crossings were authorized by Ordinance No. 812 but never constructed. (Tr. p. 121.)

22. Mr. H. C. Mauney, Vice-President and Director of the New Orleans Terminal Company, testified on direct examination that elimination of the Track B crossings would necessitate removal of "approximately 200 feet" of track at Shrewsbury Road and "approximately 300 feet" of track at Labarre Road. In addition, Mr.

Mauney estimated that 200 feet of Track C would also have to be eliminated where it crosses Shrewsbury Road. (Transcript, page 40.) An abandonment of approximately 700 feet of track would necessarily result, according to Mr. Mauney's unchallenged estimates.

23. See Lancaster v. Gulf, Colorado & Santa Fe Ry. Co., 298 F. 488, 491–492 (D.C. S.D.Tex., Hutcheson, J., 1924), appeal transferred, Gulf, Colorado & Santa Fe Ry. Co. v. Texas & Pacific Ry. Co., 266 U.S. 588, 45 S.Ct. 128, 69 L.Ed. 455, reversed, Gulf Colorado & Santa Fe Ry. Co. v. Texas & Pacific Ry. Co., 4 F.2d 904, 906 (5 Cir. 1925), reversed, 270 U.S. 266, 46 S.Ct. 263, 70 L.Ed. 578 (1926).

ers v. United States, 320 U.S. 685, 689, 64 S.Ct. 327, 330 (1944).[24] No ruling by the Interstate Commerce Commission having here been sought or otherwise obtained by the New Orleans Terminal Company, this Court must proceed with its jurisdictional determination of whether the tracks at issue come within the class of tracks enumerated in paragraph 22 which may be abandoned without Commission approval. Texas & Pacific Ry. Co. v. Gulf, Colorado & Santa Fe Ry. Co., 270 U.S. 266, 274, 46 S.Ct. 263 (1926). The validity *vel non* of Ordinances No. 3911 and No. 3967 thus becomes equated with this Court's ability jurisdictionally to order abandonment of the crossings at issue.

g. *Track B*

As the text and diagram above indicate, Track B is located parallel with and immediately adjacent to Track A. At both ends of its 11,816 foot length, switches connect Track B with Track A, and six "crossover" tracks also join those two tracks at various intervals. Testimony of the witnesses revealed that Track B was used for four types of railroad operations, all incidental to the interchange of freight cars from one railroad to another.[25]

The first use involves a once or twice daily delivery of freight cars from the Illinois Central Railroad (IC) for ultimate delivery by the NOTC to the several railroads operating out of New Orleans to the East. A stipulation of counsel reveals that during the months of November and December, 1963, and January, 1964, each "cut" of freight cars delivered by the IC onto Track B consisted of from 27 to 117 cars, and the waiting time between "delivery" by the IC and "pulling" by the NOTC ranged from three minutes to four hours and ten minutes. The average "cut" designated as having been delivered onto Track B contained 91 cars [26] and the waiting time of those "cuts" averaged one hour and 21 minutes.[27]

With the residential development of Metairie on both sides of the tracks, local authorities constructed several additional grade crossings between Labarre Road and Metairie Road. Going from west to east, Atherton Drive, Hollywood Drive (Rosewood Drive), Farnham Place (Belair Drive), and West Avenue (Cud-

---

24. Any apparent discrepancy between the holdings in State of Colorado v. United States, 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878 (1926), and United States v. State of Idaho, 298 U.S. 105, 56 S.Ct. 690 (1936), both authored by Mr. Justice Brandeis, evaporates after an initial determination of the jurisdictional "mixed question of fact and law". The Colorado case ultimately rested on § 1(18); the Idaho case on § 1(22). See also, New York Central R.R. Co. v. Chicago & Eastern Illinois R. Co., 222 F.2d 828 (7 Cir. 1955).

25. Mr. Mauney estimated that 75% of the east-west tonnage going through New Orleans passes over this NOTC "Back Belt" line (Transcript p. 13).

26. These calculations, based on the stipulation, include all "cuts" noted as having been delivered onto Track B as well as all "cuts" not so designated but containing in excess of fifty cars. Track C, the only other track to which deliveries would have been made, cannot hold more than fifty cars. Hence, "cuts" of more than 50 cars

must have necessarily been delivered to Track B.

27. Normally, and especially on interchanges of 100 or more car "cuts", Mr. Mauney related that the NOTC endeavors to meet the incoming IC train and couple an NOTC locomotive to the "cut" as soon as the IC locomotive departs. On cross-examination, however, he testified:

"Then, there [are] times when it is impossible for us, for some reason or another, [and] we can't have an engine to meet him. The IC pulls over the same way, clears Labarre Road, cuts Atherton Drive, Hollywood Drive, and then comes out and proceeds back on Second or Farnham." Transcript, p. 74.

During the three month period covered by the stipulation, 25 "cuts" in excess of 100 cars each were delivered onto Track B by the IC. Of the 24 "cuts" for which waiting times were provided, two waited for 5 minutes, one for 10 minutes, three for 15 minutes and two for 30 minutes. The waiting time for each of the other 16 "cuts" was one hour or more.

dihy Drive) all cross Track A and Track B. These crossings are not directly affected by Ordinance No. 3911 and Ordinance No. 3967 except to the extent that they relate to the operation of Track B. Whenever a long "cut" of freight cars would otherwise block one or more of those crossings, the IC train crew would uncouple the cars there to permit passage of vehicular and pedestrian traffic. Before the NOTC could "pull" those cars then, recoupling was necessary. In addition, the view of Track A would be blocked to all traffic and pedestrians approaching the crossings from the south whenever an opened "cut" of freight cars on Track B flanked a crossing.

Track B's second type of use stems from the joint operating agreement between the NOTC and the T & NO. By contract right, and in order to transfer freight cars from its Avondale yards on the west bank of the Mississippi River to other railroads in Orleans Parish, the T & NO operates one or two daily eastbound trains non-stop over all or part of Track B. (Transcript pp. 87–88.) The record stands devoid of evidence indicating whether these trains traverse Track B only when Track A, the original main line track, is blocked, or merely from operational choice. Whenever Track A is blocked then, Track B functions as a passing track; and when Track A is clear, use of Track B is unnecessary. In fact, during the time the IC "cut" is standing on Track B, operation over the full length of Track B would be impossible.

The third use of Track B also concerns the T & NO. Once a day, instead of proceeding eastbound through the area without stopping, the T & NO pauses on Track B long enough to uncouple part of its train and deliver that part onto a nearby Louisiana & Arkansas Railway interchange track. (Transcript pp. 77–78.) This operation is similar to the IC interchange operation on Track B except that only one locomotive is utilized and the waiting times are relatively more uniform and considerably shorter.

Finally, the fourth use of Track B results from various logistical movements whereby, for example, a locomotive could negotiate Track B and "run around" freight cars it had just uncoupled on Track A in order to set out or pick up other cars, or to just leave those uncoupled cars there and return to its yard.[28] In addition, when parts of Track A and Track B are both blocked, a "weaving" through movement could possibly still be effected by use of the crossover tracks and an unoccupied portion of Track B. (Transcript pp. 118–119)

### h. *Track C*

The other track constructed shortly after adoption of Ordinance No. 812 in 1942, Track C, flanks the westernmost portion of Track B on the side opposite Track A. Only at both ends of its approximate 1900 foot length does Track C connect with Track B. Generally denominated the "IC No. 1 Interchange Track" by the NOTC, the use of Track C is basically the same as the principal IC interchange use of Track B, except that the length of the "cuts" delivered onto Track C by the IC are shorter and the train crew need uncouple the freight cars at only one crossing, that being crossing 4, Shrewsbury Road. There appears no indication that waiting times between delivery and pulling of "cuts" on Track C were either of longer or shorter duration than those on Track B. Track B classifies factually as an "interchange" and "passing" track; Track C as an "interchange" track.

### i. *Legal status of interchange tracks*

In Alabama & Vicksburg Ry. Co. v. Jackson & Eastern Ry. Co., 271 U.S. 244, 46 S.Ct. 535, 70 L.Ed. 928 (1926), the Supreme Court concluded that authority to establish a junction between two railroads, constituting an extension of the carriers' lines and creating a new through route, was vested

---

28. See, for example, Transcript p. 120.

exclusively in the Interstate Commerce Commission. The court then added:

"the establishment of junctions between the main lines of independent carriers is commonly connected with the establishment of through routes and the *interchange* of car services, and is often but a step toward the joint use of tracks. Over all of these matters the Commission has *exclusive jurisdiction*." [Emphasis added.] 271 U.S. at p. 250, 46 S.Ct. at p. 537.

Without more it would appear that all interchange tracks fall within the Commission's exclusive jurisdiction. The Court quickly dispelled this impression, however, for in the very next paragraph of the same opinion it notes that matters relating to interstate railroad lines are still subject to "the exceptions specifically set forth in paragraph 22" of the Act. 271 U.S. at p. 250, 46 S.Ct. at p. 537. An interchange track, therefore, cannot automatically be classified as a § 1(18) "extension" controlled solely by the Commission since interchange tracks which are "spur, industrial, team, switching or side tracks" under § 1(22) require no Commission approval for their construction or abandonment. See Missouri Pacific R. Co. v. Chicago Great Western R. Co., 137 Kan. 217, 19 P.2d 484 (1933), rehearing denied, April 14, 1933, certiorari denied, 290 U.S. 634, 54 S.Ct. 52, 78 L.Ed. 551.

A three-judge court in Chicago, Milwaukee, St. Paul & Pacific R. Co. v. United States, 214 F.Supp. 244 (E.D. Wis.1963), was requested to "set aside and permanently enjoin" Interstate Commerce Commission orders which included a factual-legal jurisdiction determination that a 262 foot long interchange track opening a new connection between two indpendent railroads there constituted a § 1(18) "extension." In granting the relief sought, the district court held that the connecting interchange track was a "switching track" within the purview of § 1(22) despite the fact that it created a new through route connection.[29] The Supreme Court reversed "per curiam" citing only "Texas & P. R. Co. v. Gulf, C. & S. F. R. Co., 270 U.S. 266, 278 [46 S.Ct. 263, 70 L.Ed. 578]." Chicago & North Western Ry. Co. v. Chicago, Milwaukee, St. Paul & Pacific R. Co., 380 U.S. 448, 85 S.Ct. 1102, 14 L.Ed.2d 151 (1965).

The proposition that not all interchange tracks come within the exclusive jurisdiction of the Commission finds support in that litigation on several grounds. First, in addition to the 262 foot long connecting interchange track, two parallel "interchange sidings" were constructed to incidentally facilitate interchange movements. The Commission contended that "the construction of a new piece of track to enable the carriers to initiate through routes is a factor in determining whether the construction falls under Section 1(18) or Section 1 (22)."[30] If the *law* indicated conclusively that all interchange tracks were excluded from § 1(22), it is reasonable to presume that the Commission would have so argued, but since it did not, tacit Commission approval of the proposition results. The Commission considered it a *fact* question.

Secondly, the Supreme Court's "per curiam" reversal refers only to page 278 of volume 270, U. S. Reports, 46 S.Ct. 263. The discussion there concerns an "extension" of a railroad into territory already served by another railroad which could have been "inimical to the national interest."

"If the purpose and effect of the new trackage is to extend substantially the line of a carrier into new territory, the proposed trackage constitutes an extension of the railroad, within the meaning of paragraph 18, although the line be short, and although the character of the service contemplated be that commonly rendered to industries by means of spurs or industrial tracks." 270 U.S. at p. 278, 46 S.Ct. at p. 266.

29. 214 F.Supp. at p. 250.

30. Id. at p. 249.

By emphasizing that the prime concern in determining Commission control over interchange tracks is an examination of effects on the national interest, be it by extensions of lines or by new through routes which might tend to increase competition between railroads to the detriment of the general public, this language buttresses the proposition that not all interchange tracks come within the Commission's exclusive jurisdiction. Interchange tracks not affecting the "national interest" need not be Commission controlled. The three-judge district court found, however, that a new route increasing competition was created. Thus, the basis for the Supreme Court's reversal does not even inferentially require a conclusion that all interchange tracks automatically fall outside the § 1(22) exemptions. Noteworthy also is the fact that no reference was made in the "per curiam" reversal to the language quoted at length above from the Alabama & Vicksburg Ry. Co. case,[31] where the Supreme Court expressly referred to "the interchange of car services."

Finally, the "through routes", the "interchange of car services" and "joint use of the tracks" concepts off-handedly mentioned in the Alabama & Vicksburg case and reserved to the "exclusive jurisdiction" of the Commission [32] relate to the contracts and agreements between independent carriers, not to the tracks themselves. Such agreements come within a specific provision in Section 3 of the Act, and on that basis, are controlled exclusively by the Commission.[33] Agree-

ments concerning through routes, car interchanges and the joint use of tracks are the lifeblood of our national transportation system, for without them freight cars and passengers could not readily transfer from one railroad to another; the effects on interstate commerce would be drastic, to say the least. But abandonment of a track incidentally facilitating interchange operations is governed by Section 1, not by Section 3, of the Act.

#### j. No abandonment of Track A

Were the abandonment of Track A at issue in the proceeding presently before us, the Texas & Pacific and Chicago & North Western cases would clearly preclude our jurisdiction since Track A provides the main through route for interchange traffic in the New Orleans area and competes directly with the New Orleans Public Belt Railroad, an alternative interchange carrier.[34] The Public Belt would presumably be unable to immediately carry the diverted interchange traffic if Track A were abruptly removed. Interstate commerce would suffer. The Commission is required to consider such a proposal under § 1(18), not this Court. Moreover, Track A constitutes an "extension" of the NOTC lines into Jefferson Parish, and comes squarely within the protection of the Texas & Pacific case.

Track B and Track C, by comparison, do not in themselves create new through routes or extend NOTC lines, but rather are merely incidental to the functioning of Track A. In one sense the whole

---

31. 271 U.S. at p. 250, 46 S.Ct. 535.

32. Ibid.

33. See 49 U.S.C.A. § 3(4):
"All carriers subject to the provisions of this chapter shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines and connecting lines * * * and shall not discriminate in their rates, fares, and charges between connecting lines * * *."
Compare, 49 U.S.C.A. § 1(18):
" * * * Nothing in this paragraph or in section 5 of this title shall be con-

sidered to prohibit the making of contracts between carriers by railroad subject to this chapter, without the approval of the Commission, for the joint ownership or joint use of spur, industrial, team, switching, or side tracks."

34. See New Orleans Public Belt Railroad, A General Résumé of the Composition, Functions, History and Operation of the City of New Orleans' Civic-Owned and Operated Terminal Railroad (1956), New Orleans Public Library, Catalog Number 385 N52.

NOTC system constitutes an interchange track. The NOTC's chief function is the interchange of cars and trains through the New Orleans area, but, as we have noted above, not all interchange tracks are subject to the exclusive Interstate Commerce Commission control. It remains to be determined, under the facts here presented, whether Track B and Track C come within the § 1(22) exemption.

k. *General interpretation*

██ Congressional definitions of the § 1(22) terms "spur, industrial, team, switching, or side tracks" were not provided in the Act. From other sources, however, it appears clear that Track B and Track C are neither spur or industrial tracks,[35] nor team tracks.[36] Not so clear is whether Track B and Track C are switching or side tracks, especially since the terms "interchange" and "passing" tracks are not expressly found in either § 1(18) or § 1(22).

Dictionary definitions will not suffice.[37]

"[T]he purpose of the 'Interstate Commerce Act] to develop and maintain an adequate railway system for the people of the United States requires a broader and more liberal interpretation than that to be drawn from mere dictionary definitions of the words employed by Congress."

Piedmont & Northern Ry. Co. v. Interstate Commerce Comm., 286 U.S. 299, 311, 52 S.Ct. 541, 545, 76 L.Ed. 1115 (1932).

Recognizing that factually it concerned a dispute between two railroads involving the § 1(18) term "extension" and the § 1(22) terms "spur" track and "industrial" track, the Supreme Court case of Texas & Pacific Ry. Co. v. Gulf, Colorado & Sante Fe Ry. Co.,[38] authored by Mr. Justice Brandeis, stands as the landmark decision concerning the general tests to be applied when interpreting the terms found in § 1(18) and § 1(22) of the Act. As an aid to properly defining "spur, industrial, team, switching, or side tracks," that opinion states:

"Tracks of that character are commonly constructed, either to improve the facilities required by shippers already served by the carrier or to supply the facilities to others, who being within the same territory and similarly situated are entitled to like service from the carrier." 270 U.S. at p. 278, 46 S.Ct. at p. 266.

 The application of this statement to the case at bar, as well as its force, must be tempered somewhat with three observations, the first being that spur, industrial and team tracks, the types of tracks at issue there, but not here, are the types usually facilitating

---

35. Little distinction is made between a spur track and an industrial track. They invariably serve only one or a few industries and are connected with the main tracks at only one point. See United States v. State of Idaho, 298 U.S. 105, 56 S.Ct. 690, 80 L.Ed. 1070 (1936); Pennsylvania R.R. Co. v. Reading Co., 132 F. Supp. 616 (E.D.Pa.1955), affirmed, 226 F.2d 958 (3 Cir. 1955).

36. See Missouri, Kansas & Texas R. Co. v. Texas & New Orleans R. Co., 172 F. 2d 768, 769 (5 Cir. 1949); Lewis v. Terminal R.R. Ass'n of St. Louis, Mo.App., 61 S.W.2d 234 (1933); Van Metre, Trains, Tracks and Travel, p. 388 (10th ed. 1960, Simmons-Boardman Publ. Corp.):

"At nearly all stations the railroads have public 'team tracks.' These are sidetracks, along which are driveways

for wagons and trucks. Shippers and receivers of freight, who do not have industrial sidings, but whose goods are shipped in carload quantities, use these team tracks, loading shipments directly into the freight cars, and receiving shipments directly from the cars."

No loading or unloading of freight cars occurs on Track B or Track C.

37. In construing a statute, "the general purpose [of the statute] is a more important aid to the meaning than any rule which grammar or formal logic may lay down. Georgia R. & Bkg. Co. v. Smith, 128 U.S. 174, 181 [9 S.Ct. 47, 32 L.Ed. 377]." United States v. Whitridge, 197 U.S. 135, 143, 25 S.Ct. 406, 408, 49 L.Ed. 696 (1905); Shaffer v. Singh, 120 U.S. App.D.C. 42, 343 F.2d 324, 326 (1965).

38. 270 U.S. 266, 46 S.Ct. 263 (1926).

shippers *directly*, while switching and side tracks may be, and generally are, located in areas remote from shippers and designed primarily to expedite railroad operations which are necessary, but incidental, to a regular train haul, thereby only *indirectly* facilitating shippers.[39] The second observation stems from a response by the NOTC superintendent on cross examination wherein he indicated that railroad classification yards are generally considered as composed of switch tracks, both in railroad parlance [40] and in his own vocabulary. (Transcript p. 126.) Quite regularly the interchange of cars is accomplished in classification yards.[41] Thirdly, absent is language restricting the meaning to only *direct* shipper facilities. Thus, either by force of universal recognition in the trade or by judicial admission, this Court considers classification yard tracks to be "switching" tracks within the plain meaning of § 1(22) even though not located in the shipper's territory and not serving the shipper in the same direct manner as do most spur, industrial and team tracks. The net effect of these observations is that the interpretive principle of *noscitur a sociis* [42] does not restrict the meaning of the § 1(22) terms "switching" track and "side" track to those tracks *directly* serving shippers, but suggests instead a slightly broader interpretation of those terms in this case than the interpretation which at first blush appears in the Texas & Pacific case, provided, of course, no damage accrues to the Congressional intention of protecting the general public by preserving its means of commerce. Moreover, the Supreme Court's Texas & Pacific interpretation appeared prior to the "National Transportation Policy" statement adopted by Congress in 1940.[43] This express indication of legislative intent underscores the need for additional analysis.

*l. Dictionary definitions*

Though not the place to end, dictionary definitions do provide an orientation place from which to start. See Missouri, Kansas & Texas Ry. Co. v. Texas & New Orleans R. Co., 172 F.2d 768, 769 (5 Cir. 1949). Webster's Third New International Dictionary, p. 2113,

---

39. Spur, industrial, team, switching and side tracks "are for use in loading, reloading, storing, and switching the cars and other things merely incidental to the regular train haul." Detroit & Mackinac Ry. Co. v. Boyne City, Gaylord & Alpena R. Co., 286 F. 540, 547 (D.C.E.D.Mich.1923).

40. See Van Metre, op. cit. supra, note 36 at pp. 402–403.

41. "In the classification yards, cars are sorted and distributed.

 * * * * *

"Many of the cars which move through freight [classification] yards in the large cities are passing from one railroad to another. Where two railroads meet and connect so that cars can be moved from one to the other, the point of transfer is called a junction, or an interchange point. When a car is delivered by one railroad to another, the car is said to be interchanged." Association of American Railroads, The Stories Behind the Pictures, pp. 46–47 (7th Ed. 1956). See also, Van Metre, op. cit. supra, note 36 at pp. 402–403:

"How are cars sorted and distributed in a freight yard? An incoming train enters the receiving yard. The road locomotive which has pulled the train is uncoupled and it steams away to the engine house. A switch engine moves the caboose off to a caboose track, where it stays until needed for another train. The work of sorting the cars then begins. They must be divided up according to their destinations, and each car placed on its proper track in the classification yard. Perhaps you have watched a postmaster sort letters in a post office and place the letters in mail boxes. Cars are sorted in just the same way. One classification track receives the cars for certain industrial sidings, another track the cars for other sidings; a third track receives the cars for one freight house, a fourth track, the cars for another; a fifth track gets the cars for a team track, and a sixth track, the cars that are to go on to another town and so on."

42. "It is known from its associates. 1 Vent. 225. The meaning of a word is or may be known from the accompanying words." Black's Law Dictionary, p. 1209 (4th Ed. 1951). The five terms are all specifics; none are general.

43. See Note 46, infra, and part III (m).

(1961 Ed. Unabridged), defines a side track as a "siding", which in turn is designated

> "a short railroad track connected by switches or points at one or more places with the main track and used esp. to enable trains to pass each other or to provide a storage place for temporarily idle cars—called also *sidetrack.*"

Under the definition of "switch", Webster's at p. 2313 denominates a switch track as a "railroad sidetrack", and Black's Law Dictionary p. 1618 (4th Ed. 1951), makes reference to a switch track as a "track in the nature of a sidetrack adjacent to and used in connection with another line of track."

■ On that basis, the terms "switching" and "side" tracks reveal a concept wherein incidental movements of freight cars between points of origin and destination would utilize these tracks, regardless of their lack of proximity to the actual shippers, for switching, passing or temporary storage adjacent to a main line track. For instance, freight cars moving from Texas to Florida frequently are switched through the NOTC Oliver Yard located in New Orleans. Those classification yard tracks are admittedly switch tracks within the common meaning of that term despite their remote location from Texas and Florida shippers. At the same time, the tracks are located in proximity to many New Orleans shippers. Such tracks are more remote from Texas and Florida shippers than from New Orleans shippers but in both instances they function incidentally to the "regular train haul."[44]

The same holds true for Track B and Track C. Briefly stated, Track B is a relatively short track connected by switches and crossovers at several points with the main track, Track A. On those occasions when Track A is occupied and trains or locomotives travelling through the area traverse all or part of Track B, Track B serves as a passing track adjacent to and in connection with Track A; and when freight cars are temporarily stored on either Track B or Track C in effecting an interchange, those tracks function as a sidetrack. To the extent that interchanging, uncoupling and recoupling occur, or logistical movements take place, those tracks are utilized in a manner closely related to activities associated with switching tracks in classification yards. This summary analysis indicates that both Track B and Track C fall within the literal dictionary definitions of "switching, or side tracks."

m. *National policy definitional standards*

■ The terms "switching" and "side" tracks must, however, be construed in light of the Interstate Commerce Act's general purpose.[45] In 1940 Congress added a statement of "National Transportation Policy" to the act wherein it was declared that provisions of the Act "shall be administered and enforced with a view" towards promoting "safe, adequate, economical and efficient service," and fostering "sound economic conditions * * *;—all to the end of developing, coordinating, and preserving a national transportation system * * *[46]

44. See Note 39, supra.

45. See Missouri Pacific R. Co. v. Austin, 292 F.2d 415, 418–419 (5 Cir. 1961), and note 37, supra.

46. "It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and

Implementing this statement of policy, the Supreme Court noted in City of Yonkers v. United States that "[u]nderlying § 1(22) is a Congressional policy of reserving exclusively to the States control over that group of essentially *local activities*. See H. Rep. No. 456, 66th Cong., 1st Sess., p. 18." [47] Reference to this 1919 House Report reveals that the railroads' economic circumstances were paramount in the mind of Congress when the Transportation Act's pertinent amendments to Section 1 were adopted.[48] A subsequent portion of the same report indicates that the "public convenience and necessity" and the non-impairment of a carrier's ability "to perform its duty to the public" also received consideration.[49] As a matter of Congressional policy, the Commission is granted power to regulate abandonments which might economically weaken a carrier, reduce safety, or adversely affect the adequacy or efficiency of the national transportation system by impairing service to the general public through hindrance of the railroads' development, co-ordination and preservation. Conversely, in § 1(22)

of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy." 49 U.S. C.A. Act Sept. 18, 1940, ch. 722, title I, § 1, 54 Stat. 899; also set forth in the "Historical Note" preceding 49 U.S.C.A. § 1.

47. [emphasis supplied] 320 U.S. 685, 690, 64 S.Ct. 327, 330 (1944). The Court continued:
"We recently stated that the extension of federal control into these traditional local domains is a 'delicate exercise of legislative policy in achieving a wise accommodation between the needs of central control and the lively maintenance of local institutions.' Palmer v. [Commonwealth of] Massachusetts, 308 U.S. 79, 84 [60 S.Ct. 34, 84 L.Ed. 93]. In the application of the doctrine of the Shreveport case [Houston, E. & W. T. R. Co. v. United States, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341], this Court has required the Commission to show meticulous respect for the interests of the States. It has insisted on a 'suitable regard to the principle that, whenever the federal power is exerted within what would otherwise be the domain of state power, the justification of the exercise of the federal power must clearly appear.' [State of] Florida v. United States, 282 U.S. 194, 211–212 [51 S.Ct. 119, 75 L. Ed. 291]." 320 U.S. at p. 690, 64 S.Ct. at p. 330.

48. "EXTENSIONS AND ABANDONMENTS.
"Section 402 further provides that extensions of an existing railroad or the construction of a new line or the abandonment of a line shall not be permitted unless and until there shall have been obtained from the commission a certificate that the present or future public convenience and necessity require or will require such construction or abandonment. A like provision can be found in the statutes of a number of States. Your committee believes that the requirement of such a certificate, so far as extensions are concerned, will tend to stabilize existing conditions and prevent the construction of unnecessary or parallel lines which, without any reasonable hope of profitable operation, would become a burden to the public. A similar provision in the laws of several States has proven successful in preventing the construction of weak lines. This provision of the bill, however, does not extend to the construction or abandonment of sidetracks, or of spur, industrial, team, or switching tracks, or of street car and electric interurban lines, if such tracks or lines are located or are to be located wholly within one State." 4 Rep. No. 456, 66th Cong., 1st Sess., p. 18.

49. "Paragraphs (17) to (21) [now (18) to (22)] inclusive, confer upon the commission jurisdiction to prohibit carriers by railroad subject to the act from undertaking the extension of their lines or the construction or acquisition of new lines unless a certificate of public convenience and necessity has been obtained from the commission. It is provided that upon receipt of any application for such certificate the commission shall notify and grant hearing to the proper regulatory body in the State affected. The commission is also given power after hearing to require a railroad to provide itself with safe and adequate facilities for performing its car service and to extend its line if the commission finds that this is required in the interest of public convenience and necessity, and will not impair the ability of the carrier to perform its duty to the public." Id. at p. 28.

Congress reserved to State governmental institutions the authority to regulate certain tracks located "wholly within one State" when these tracks involve "local activities," that is, activities not adversely affecting the safety, adequacy or efficiency of the general public's transportation system. If abandonment of particular tracks would impair the national transportation system, then they could not be considered "switching or side tracks" within the meaning of § 1 (22), and the Commission would have exclusive jurisdiction. But if removal of the tracks did not impair service to the public, the several States and this Court possess jurisdiction, not the Commission. The applicable policy standards in this determination are for Commission and Court identical.[50]

n. *Policy definitions*

 A state would be constitutionally unable to prohibit completely the loading or unloading of interstate freight shipments despite its power to order abandonment of tracks on which those operations take place. Such a blanket prohibition would unreasonably impede "commerce", and circumvent the intent of Congress. Yet through § 1(22) States are authorized to regulate "where" the loading or unloading can be accomplished.[51] Similarly, States cannot prohibit completely the interchanging of freight cars even when it occurs on "switching or side tracks", but they should be permitted to specify "where" the interchanging takes place when this direction involves no conflict with Congressional policy. In the same general sense that the loading or unloading of freight cars is a "local activity", so also is the interchanging of freight cars.[52]

The railroads connecting with the NOTC in Shrewsbury and Metairie all maintain nearby classification yards.

Diagram 2

TP-MP yard

T&NO yard

IC yard

L&A yard

NOTC Oliver yard

[schematic – not to scale]

Freight cars destined for interchange via the NOTC are classified and coupled in those yards, and thereafter delivered to the NOTC. The IC delivers its "cuts"

---

50. The Supreme Court employed substantially similar criteria in the Texas & Pacific Case. See 270 U.S. at pp. 277–278, 46 S.Ct. 263.

51. Control over loading and unloading tracks controls "where" the loading and unloading can be performed. These are "facilities required by shippers" within the meaning of the Texas & Pacific case, 270 U.S. at p. 278, 46 S.Ct. 263.

52. Loading, unloading and interchanging all occur "locally"; all affect interstate commerce.

onto Track B and Track C.[53] No absolute necessity dictates that the "interchanging occur on Track B and Track C. Deliveries could be accomplished in the classification yards. The T & NO does it that way. The T & NO, starting at its Avondale yard on the west bank of the Mississippi River, proceeds across the Huey P. Long bridge and the "Back Belt" in making its deliveries directly to the NOTC Oliver classification yard without having to set cars out on Track B or Track C.[54]

Forced removal of Track A, an integral part of the "Back Belt" line, would effect a prohibition or substantial diminution of interchanging in the New Orleans area and would be precluded.[55] Forced removal of Track B and Track C, however, would still permit interchanging. The precise location of the interchange matters little to the Congressional transportation scheme, so long as it is permitted in a manner which does not materially detract from the functioning of the overall system. An examination must follow concerning the degree, if any, to which removal of Track B and Track C would affect safety, adequacy, cost, efficiency, development, coordination, and preservation of our national transportation system in general, and the NOTC, a vital link in that system, in particular.[56]

o. *Safety and adequacy*

The safety of area residents, a keystone in the structure supporting Ordinances No. 3911 and No. 3967, would be enhanced by elimination of the switching

and storage operations incidental to interchanges on Track B and Track C.[57] Additionally, railroad safety is furthered when the intermediate storage of freight cars is obviated and the consequent number of coupling and uncoupling hazards to be encountered by railroad employees is reduced. Fewer switches lowers the possibility of derailments;[58] curtailed switching and sidetrack operations contiguous to a mainline track lessen chances of collisions.[59]

Presence of nearby classification yards indicates there exists an adequacy of interchange facilities. All cars interchanged by the NOTC eventually reach those yards, and the NOTC has failed to show that the cars are not there adequately handled.

p. *Cost and efficiency*

Cost and efficiency factors are closely related. Present agreements between the NOTC, IC and L & A for delivery of interchange "cuts" to the tracks in Metairie apparently rest on mutual conclusions that delivery there is cheaper and more convenient than delivery directly into the classification yards. Elimination of the average one hour 21 minute waiting time[60] suffered by freight cars standing idle on Track B and Track C would increase, not hinder, efficiency by expediting shipments. Reduced waiting time in turn affects "per diem" charges for the use of another railroad's freight cars. The less time one railroad controls another's cars, the lower are its "per diem" costs. A "per diem" cost saving to the IC might impart a cost increase on the NOTC, and vice versa,[61] but after

53. See parts III(g) and III(h). The L&A makes its deliveries in the area to other tracks not here at issue.

54. See part III(g), "second use".

55. See part III(j).

56. See part III(m).

57. The ordinances are set forth in Appendix D and Appendix E, respectively.

58. Additional switches on a mainline track increase chances of open, broken or misaligned points causing a train wreck.

59. The storied "Casey Jones" might never have perished if the sidetracked freight had cleared the main line.

60. See text accompanying note 27 in part III(g), and part III(h).

61. Mr. Dunbar, NOTC Superintendent, guessed that delays caused by removal of Track B and Track C "could mean the difference between getting rid of fifty or one hundred cars, and not getting rid of them" before midnight when an additional "per diem" charge affixes. Transcript pp. 105–106. The receiving carriers, however, would save that amount.

this re-allocation, the overall cost to the national transportation system remains unchanged. Direct delivery also affects the allocation and expense of locomotives and train crews. For instance, if the IC, by agreement with the NOTC, were to hereafter commence delivery of its "cuts" into the Oliver Yard and return with cars destined for the IC, increased locomotive and train crews cost would be initially borne by the IC.[62] Again, theoretically, a saving to one would offset any increase to the other.

▋ Whether this theory proves workable need not concern the Court. On its face it indicates that no unreasonable national cost consequences necessarily result. The interchange and joint operating agreements between the individual carriers determine whether the burdens fall mainly on one carrier rather than another, or are balanced. Prevention of unreasonable, improper and unequal agreements is an obligation of the Interstate Commerce Commission, and an aggrieved railroad possesses statutory recourse to the Commission for relief.[63] For this Court to assume that the NOTC, or any other carrier involved herein, would be unduly burdened by the agreements required to offset the removal of Track B and Track C, it would be necessary to indulge in the presumption that the participating carriers would be unreasonable *and* that the Commission would abdicate its function. Such a presumption is preposterous. The machinery exists to prevent discriminatory burdens. From efficiency and cost standpoints then, neither the national system nor any individual railroad would suffer to any degree, if at all, following removal of Track B and Track C, and incidental contractual adjustments. A distinct probability of increased efficiency and cost savings suggests itself instead.[64]

### q. Development, coordination and preservation

Considering effects on development, coordination and preservation of our national transportation system, we note the possibility that the volume of rail traffic and the number of trains moving through the New Orleans area via the "Back Belt" line might require construction of a double mainline track for two-way operations.[65] During the course of this litigation the NOTC hinted an application to the Commission for permission to build the additional track is already contemplated in order to better coordinate and properly develop NOTC services. Should the Commission determine that the volume of rail traffic through the Metairie area justified construction of the second mainline track to permit two-way operations, Jefferson Parish authorities would be precluded from ordering its removal unless its use degenerated to the status of a track coming within § 1(22) of the Act.[66] At the moment, though, we perceive no retarding effect on development, coordination and preservation of the national transportation system resulting from removal of Track B and Track C.

### r. Policy and main claim conclusion

▋ This Court therefore concludes that the Interstate Commerce Act's policy and purpose of reserving to the States power to order abandonments of tracks which do not economically jeopardize service to the public contemplate tracks such as Track B and Track C being characterized as "switching or side tracks" within the meaning of § 1(22). These

---

62. Mr. Dunbar further estimated that if the NOTC were delayed or required to perform these services, it "would cost New Orleans Terminal Company approximately $100.00 a day in additional wages." Transcript p. 105.

63. See part III(k), especially text accompanying note 33.

64. Faster movement of loaded cars benefits shippers, an efficiency factor; faster movements of "empties" [see part III (d)] reduces "per diem" charges to all intermediate carriers, a cost factor; and a faster return of the "empties" increases the opportunity for additional revenue producing loadings, an income factor.

65. Mr. Dunbar spoke in terms of there being a present need for a second mainline track. Transcript pp. 101-110.

66. See part III(j).

tracks, including those portions directly affected by Ordinances No. 3911 and No. 3967, do not form part of an independent through route; they do not invade the territory of other carriers; nor do they affect competition since they do not provide shorter or alternative routes for shippers.[67] To the contrary, they are used to temporarily store cars being interchanged; they permit the passing or sidetracking of trains; and they facilitate switching movements; all of these operations are merely incidental to regular train hauls.[68] Policy and dictionary definitions being harmonious in their characterization of Track B and Track C as tracks expressly excluded from Congressional control, it is adjudged that Jefferson Parish Ordinances No. 3911 and No. 3967 are not in violation of the provisions and prohibitions of the Constitution of the United States and the Constitution of the State of Louisiana.

## IV. *The Counterclaim*

██ Defendants' counter action against the NOTC seeking judgment declaratory of the ordinances' validity can be resolved on the basis of the foregoing findings, principally. The ordinances were neither exercises of non-delegated authority,[69] nor violative of constitutional property [70] and contract rights,[71] nor encroachments upon exercised Congressional commerce powers.[72] State regulation of railroad grade crossings for promotion of public safety emanates from the police powers retained

by all States. The Supreme Court has said that:

"where railroad companies occupy lands in the state for use in commerce, the state has a constitutional right to insist that a highway crossing shall not be dangerous to the public, and that, where reasonable safety of the public requires abolition of grade crossings, the railroad cannot prevent the exercise of the police power to this end by the excuse that such change would interfere with interstate commerce or lead to the bankruptcy of the railroad." Lehigh Valley R. Co. v. Board of Public Utility Commissioners, 278 U.S. 24, 34, 49 S.Ct. 69, 72, 73 L.Ed. 161 (1928); American Trucking Ass'ns, Inc. v. United States, 242 F.Supp. 597, 600 (D.C. 1965) [73]

Jefferson Parish ordinances No. 3911 and No. 3967, being grounded on public safety [74] and emanating from the police power, and not invading an area subject to the exclusive jurisdiction of the Interstate Commerce Commission, are hereby adjudged valid.[75]

## APPENDICES

### APPENDIX A *(Exhibit P–3)*:

#### Ordinance

On motion of of Wm. Luke duly seconded by Mr. Betz, the following ordinance was adopted;

Be it ordained by the Police Jury of the Parish of Jefferson, that the plans

---

67. Ibid.

68. See parts III(g) and III(h).

69. See parte III(a).

70. See part III(b).

71. see part III(c).

72. See parts III(d) through III(r), inclusive.

73. American Trucking Assn's., Inc., appealed this three-judge court decision directly to the Supreme Court where it is now pending consideration as No. 662, October Term, 1965. [34 U.S.L. Week

3133, 10/19/65.] The applicability of a state's police power to safety regulation of railroad grade crossings is only one of several issues raised therein.

74. Concern for public safety is repeatedly expressed in the ordinances. See Appendix D and Appendix E.

75. The Ordinances relate only to the portions of track involved in crossings 1, 3 and 4, see note 21, supra, but a determination of the ordinances' validity necessarily included a determination of the whole track's status.

submitted by the New Orleans and Western Railroad in their letter of October 12, 1895, for the crossing by said road over the five public ways traversed by its route of.the Company's line in the Parish of Jefferson, and which are in detail as follows:

Plan No. 1, shows the crossing over the upper Protection Levee. The top of the rail in this case is only 10″ above the present level of the roadway, the slope of the approach is 10–1 and the crossing is 32′ wide, the space between the rails, and one foot on the outside is covered with heavy pine planks, the slope of the approach is filled and designated in the drawings with brick bats and other hard material.

Plan No. 2, is that of the crossing over the Metairie Road showing the same width of roadway, same slope, and the same construction as Plan No. 1.

Plan No. 3 is of the crossing over the Labarre Road and is identical in construction and slope as Plan No. 1.

Plan No. 4 is of the crossing over Harlem Avenue, as the Avenue is entirely unused and is not likely to be used to any great extent in the near future the plan shows a construction the same as Plan No. 1, but a smaller width of roadway and greater slope of approach if ever this avenue becomes used to the same extent as Metairie and Labarre Roads, the company will widen this crossing and put in the same slope as exists on the other roads.

Plan No. 5 is of the crossing over Shrewsbury road or Severn Avenue, and is identical in construction, material and slope as Plan No. 1.

Be and the same are hereby approved, on the condition that the said company by the acceptance of this ordinance obligated itself at all times to maintain these crossings in good order, and up to the grade indicated on the plans, and to carry out all the agreements and stipulations contained in said letter.

The roll being called on the adoption of the above ordinance the vote resulted as follows:

YEAS: Marrero, Veiring, Brady, Lazarre, Luke and Betz

NAYS: Kielman

BLANK: Hart

ABSENT: St. Martin

*APPENDIX B*

STATE OF LOUISIANA
PARISH OF JEFFERSON

To the Honorable,
President and Members
of the Police Jury,
Parish of Jefferson
Gretna, Louisiana

Gentlemen:

The undersigned members of your Committee, appointed at your meeting held on the 18th day of November, 1942, at which we were given full power to act in the matter of the application of the NEW ORLEANS TERMINAL COMPANY, for permission to construct certain railroad tracks across the Labarre and Shrewsbury Roads and the Airline Highway, beg leave to report that we conferred about this matter, with the representatives of the railroad company, and we herewith return the original ordinance with our approval, and with the grant of permission as contained in the ordinance.

Respectfully,

(sgd) J. J. Holtgreve
(J. J. Holtgreve)

(sgd) Ernest Riviere
(Ernest Riviere)

(sgd) Robert Otterman
(Robert Otterman)

(sgd) Alvin E. Hotard
(Alvin E. Hotard)
Parish Engineer

November 20th, 1942

On motion of Mr. Feitel, seconded by Mr. Perrin, that the following resolution be adopted:

BE IT RESOLVED That the report of the Special Committee appointed to act on

the application of the New Orleans Terminal Company, for permission to construct additional crossings over Labarre and Shrewsbury Roads and the Airline Highway, dated November 20, 1942, be approved and accepted by this Police Jury.

ROLL CALL on the adoption of the above resolution resulted as follows:

YEAS: Haas, Strehle, White, Gendron, Cantrelle, Feitel, Meyer, Gordon, Petit, Perrin, Otterman, Riviere, Holtgreve and Toledano

NAYS: None

ABSENT: None

And said resolution was declared unanimously adopted [December 9, 1942].

*APPENDIX C (Exhibit P–6):*

Ordinance No. 812

By Mr. Feitel

Seconded by: Mr. Perrin

AN ORDINANCE

Granting Permission to the NEW ORLEANS TERMINAL COMPANY

a) For the crossing by the said railroad over the Labarre Road, with one (1) additional crossing;

b) For the crossing by the said railroad over the Shrewsbury Road, with four (4) additional crossings; and

c) For the crossing by the said railroad over the Airline Highway, with one (1) additional crossing

at the present intersection of said railroad with said three highways, as the same are described in detail on drawings Nos. 19656, dated September 19, 1942, and 19658, dated September 1, 1942 and revised September 25, 1942, which are attached to this ordinance; and providing the conditions under which this permit is granted.

WHEREAS, the New Orleans Terminal Company, a common carrier railroad, engaged in serving the public, and also engaged in the handling of large quantities of National Defense material, has, in its letter of November 9, 1942, applied to this Police Jury for a permit in order to move the National Defense Materials and its other freight and business expeditiously, to establish one additional bituminus grade crossing for an additional track to be constructed by it at Labarre Road, and four bituminus grade crossings for four additional tracks to be constructed by it at Shrewsbury Road, and one additional bituminus grade crossing for an additional track, to be constructed by it at Airline Highway, in the locations set out in prints of drawings No. 19656, date September 19, 1942, and No. 19658, revised to September 25, 1942, which have been filed with this Police Jury; and

WHEREAS this police Jury has been informed that the said crossings have been approved by the State of Louisiana, Department of Highways, under a permit granted October 24, 1942, Serial No. 4399, and also approved by the Louisiana Public Service Commission, under date of October 26, 1942:

THEREFORE, BE IT ORDAINED BY THE POLICE JURY OF THE PARISH OF JEFFERSON, in regular session assembled, that the NEW ORLEANS TERMINAL COMPANY be and it is hereby granted permission:

a) For the crossing by the said railroad over the Labarre Road, with one (1) additional crossing;

b) For the crossing by the said railroad over the Shrewsbury Road, with four (4) additional crossings; and

c) For the crossing by the said railroad over the Airline Highway, with one (1) additional crossing

at the present intersection of said railroad with the said three above named highways, all in the Parish of Jefferson, State of Louisiana, and which said crossings are more fully described in detail on Drawings No. 19656, dated September 19, 1942, and No. 19658, dated September 1, 1942, and revised to September 25, 1942, blue prints of which drawings are at-

tached to this ordinance, and on file with this Police Jury.

SECTION II: BE IT FURTHER ORDAINED, etc., That the said plans submitted by the New Orleans Terminal Company, in its letter of November 9, 1942, be and the same are hereby approved, and this permit granted to the said New Orleans Terminal Company, on the condition, that the said New Orleans Terminal Company, by the acceptance of this ordinance, obligates itself at all times to maintain these crossings in good order and condition, and up to the grade indicated on the said drawings.

ROLL CALL on the passage of the above ordinance, resulted as follows:

YEAS: Haas, Strehle, White, Gendron, Cantrelle, Feitel, Meyer, Gordon, Petit, Perrin, Otterman, Riviere, Holtgreve, & Toledano

NAYS: None ABSENT: None

November 20, 1942:

The above ordinance having been considered by the undersigned committee appointed by the Police Jury on Wed., Nov. 18, 1942, with full power to act in the premises, the same is hereby approved and the permit outlined in the above ordinance is hereby granted the New Orleans Terminal Co.

(sgd) J. J. HOLTGREVE, ERNEST RIVIERE, ROBERT OTTERMAN, ALVIN E. HOTARD, Parish Eng.

Approved: (sgd) JNO. E. FLEURY, District Attorney

APPENDIX D (Exhibit P–8):

SUMMARY No. 216

ORDINANCE NO. 3911

An ordinance repealing and rescinding Ordinance No. 812 (minute book 15, folio 116, meeting of Dec. 9, 1942) and providing for and ordering the removal of the additional track crossings granted as a National Defense measure under Ordinance No. 812.

WHEREAS, permission for additional track crossings was granted to the New Orleans Terminal Company in Ordinance No. 812 for the specific purpose of expediting the handling of large quantities of National Defense materials made necessary by the state of National Emergency during World War II; and

WHEREAS, the purpose of Ordinance No. 812 is no longer existent since the cessation of hostilities of World War II; and

WHEREAS, by the leasing of wheeling rights and the granting of contracts to other railroads, which traverse a strictly zoned residential community with rapidly increasing population, the New Orleans Terminal Company has:

(a) Allowed these tracks to become a marshalling yard with a complete lack of consideration for property owners adjacent to the tracks. The making up of trains by the various lines operating on this back belt track is a 24-hour operation, and the humping and bumping causes property damage and mental anguish to the residents;

(b) Created a disturbance of the peace and public nuisance by humping and bumping, blasting loud horns and whistles, parking mechanized refrigerated cars, and cars full of live cattle at all hours of the day and night;

(c) Endangered life and property by the switching and parking of tank cars containing highly explosive, inflammable and/or combustible materials;

(d) By blocking the crossings the railroads using the tracks (1) decrease fire-protection available to all Metairie residents and (2) in case of a local emergency could cause a complete breakdown in civil defense evacuation plans for this area.

NOW, THEREFORE, the Jefferson Parish Council hereby ordains that Ordinance No. 812 be and is hereby repealed and rescinded, and the New Orleans Terminal Company is hereby notified to remove within thirty (30) days all addi-

tional track crossings granted under Ordinance No. 812.

THE JEFFERSON PARISH COUNCIL FURTHER ORDAINS:

That the Parish President and the Parish Attorney are hereby authorized to call upon and demand of said New Orleans Terminal Company that immediate action be taken for the removal of said additional track crossings, granted under Ordinance No. 812.

THE JEFFERSON PARISH COUNCIL FURTHER ORDAINS:

That the Parish President and the Parish Attorney are hereby authorized and empowered to take whatever action is necessary either by suit or otherwise to compel the removal of said track crossings.

THE JEFFERSON PARISH COUNCIL FURTHER ORDAINS:

That the Sheriff's Department be notified immediately of the passage of this Ordinance and authorized to enforce the terms thereof.

THE JEFFERSON PARISH COUNCIL FURTHER ORDAINS:

That this Ordinance is enacted for the purpose of protecting the public health, safety and welfare and in the interest of the systematic planning of the Parish.

This Ordinance shall become effective on the 1st day of February, 1959.

This ordinance having been read in full on this 29th day of December, 1958 and submitted to a vote, the vote thereon was as follows: Yeas: 7. Nays: None. Absent: None.

And the Ordinance was declared adopted on this the 29th day of December, 1958.

*APPENDIX E (Exhibit P–9):*

EMERGENCY ORDINANCE No. 3967
ORDINANCE NO. 3911 As Amended
By Mr. Dwyer
Seconded by: Mr. Haynes
AN EMERGENCY ORDINANCE AMENDING ORDINANCE NO. 3911

PROVIDING FOR AND ORDERING THE REMOVAL OF THE ADDITIONAL TRACK CROSSINGS GRANTED AS A NATIONAL DEFENSE MEASURE UNDER ORDINANCE NO. 812 SO AS TO PROVIDE FOR A PENALTY FOR VIOLATION OF SAID ORDINANCE IN NOT REMOVING SAID TRACK CROSSINGS; PROVIDING FOR A PENALTY FOR VIOLATION OF SAID ORDINANCE IN USING SAID TRACK CROSSINGS HEREIN PROHIBITED, ALL IN VIOLATION OF THIS ORDINANCE: AND PROVIDING FOR SEPARABILITY OF EACH SECTION, SUB–SECTION, PARAGRAPH, SENTENCE, CLAUSE OR PHRASE OF THIS ORDINANCE.

WHEREAS, there was no penalty provided for in the adoption of Ordinance No. 3911 on December 29, 1958, and

WHEREAS, the Jefferson Parish Council desires to provide for penalties in said Ordinance No. 3911, and

WHEREAS, in order to meet a public emergency affecting life, health, property and public safety:

THE JEFFERSON PARISH COUNCIL HEREBY ORDAINS:

SECTION 1, That Ordinance No. 3911 of the Parish of Jefferson is hereby amended so as to include the three following sections:

Section 2. Whoever willfully violates any provision of this Ordinance by either failing to remove immediately the track crossings covered within this said Ordinance, or whoever willfully violates any provision of this Ordinance by willfully using the track crossings covered within said Ordinance, shall be fined not less than Ten Dollars ($10.00) nor more than One Hundred Dollars ($100.00) or be imprisoned for not less than one (1) day nor more than thirty (30) days, or both. Each day that the violation continues shall be deemed a separate offense.

Section 3. If any section, sub-section, sentence, clause, or phrase of this Ordinance shall, for any reason, be held to be

unconstitutional by any court of competent jurisdiction, such decision shall not affect the validity of the remaining portions and sections of this Ordinance, which shall continue in full force and effect.

Section 4. This amended Ordinance shall be effective immediately on same date of adoption thereof.

This Ordinance having been submitted to a vote, the vote thereon was as follows:

YEAS: 7

NAYS: None

ABSENT: None

The Ordinance was declared to be adopted this the 5th day of March, 1959.

## APPENDIX F

### JEFFERSON PARISH OFFICIALS

| Office | Original Defendants | Substituted in 1960 | Elected in 1964 |
|---|---|---|---|
| President | Charles W. Spencer | Marion Dan Hogan | Thomas F. Donelon |
| Council Chairman | A. Russell Roberts | Cullen C. Schouest | Charles J. Eagen, Jr. |
| Council Members | Beauregard H. Miller, Jr. | Beauregard H. Miller, Jr. | Beauregard H. Miller, Jr. |
| | Robert J. Duplantis | Donald T. Gillen | Harold L. Molaison |
| | Frederick J. R. Heebe | Frederick J. R. Heebe | James J. LaForest, Jr. |
| | John G. Fitzgerald | Anthony Caramonta | Jacob H. Sciambra |
| | William J. Dwyer | George J. Ackel | George J. Ackel |
| | Vernon C. Haynes | Vial J. Blanke | Anthony Pilney |
| Sheriff | William S. Coci | John G. Fitzgerald | Alwynn Cronvich |
| Parish Attorney | Philip B. Smith | Harold E. Kytle | Louis G. DeSonier |
| District Attorney | Frank H. Langridge | Frank H. Langridge | Frank H. Langridge |